In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-06-141 CV


____________________



CHRISTUS ST. MARY HOSPITAL, Appellant



V.



ANNE BUCKLIN O'BANION, INDIVIDUALLY AND ON BEHALF OF ALL


WRONGFUL DEATH BENEFICIARIES, AND AS REPRESENTATIVE OF


THE ESTATE OF RICHARD WYNNE O'BANION, SR., Appellees






On Appeal from the 58th District Court


Jefferson County, Texas


Trial Cause No. A-170,935






OPINION


 Appellee Anne Bucklin O'Banion, acting individually and as representative of the
estate of Richard Wynne O'Banion, Sr., filed suit against appellant Christus St. Mary
Hospital ("Christus"). She alleged that Christus's medical negligence caused the death of
her husband. The decedent's children, appellees Richard Wynne O'Banion, Jr., James Alden
O'Banion, and Ray Edward O'Banion, intervened in the lawsuit as plaintiffs. A jury found
that Christus's negligence proximately caused the death and awarded damages to appellees. 
Christus filed this appeal, in which it raises three issues for our consideration. We reverse
and render judgment that appellees take nothing from Christus.

The Evidence


 Richard Wynne O'Banion, Sr. ("O'Banion") was admitted to Christus St. Mary
Hospital after suffering a heart attack. O'Banion had a history of coronary artery disease,
diabetes, renal insufficiency, and heart surgery. During treatment, O'Banion's condition
began to improve. However, during his stay at Christus, O'Banion fell while a nursing
assistant was helping him from the bathroom. A CT scan revealed that as a result of the fall,
O'Banion suffered a complex fracture of the right zygomatic maxillary area and several small
intracranial hematomas. The CT scan also showed "encephalomalacia of the right parietal
lobe from previous cerebrovascular accidents." After his discharge from St. Mary Hospital,
O'Banion went to Magnolia Manor Nursing Home, where he died a few days later.

 At trial, appellees offered testimony from four physicians: Drs. Udonta, Croft, Smith,
and Meissner. Dr. Emen Dan Udonta, O'Banion's treating neurologist at Christus, testified
that he reviewed O'Banion's CT scan, which revealed "multiple areas of abnormality which
were consistent with intracerebral hemorrhage, and . . . an area of maxillary fracture. . . ." 
According to Dr. Udonta, the CT also revealed areas of encephalomalacia from previous
strokes. Dr. Udonta explained that the CT scan also showed "multiple areas of tiny
hemorrhagic densities" that resulted from trauma to the brain. Dr. Udonta testified that after
the fall, O'Banion's prognosis was "very guarded," meaning "that the mortality rate would
be high." Dr. Udonta opined that the mortality rate was seventy-five to eighty percent.
Therefore, Dr. Udonta ordered only comfort care for O'Banion. Dr. Udonta testified that
more likely than not, the head injury "contributed to [O'Banion's] death possibly." Dr.
Udonta further explained, "here we have someone who has enough medical problems to
begin with; and then adding additional brain injuries would make a difference." On cross-examination, Dr. Udonta testified, "This is a chap who had . . . coronary artery disease,
diabetes mellitus, and he . . . was just admitted for a cardiac cath urgently, meaning that he
had severe coronary artery disease. That combination kind of . . . gives me a high morbidity-slash-mortality."

 Dr. Steven Michael Croft, a neurologist retained by the plaintiff to address the issue
of causation, testified that O'Banion fell "with enough force to cause a fracture of his right
cheekbone or his zygomatic arch and to cause contusions or bruising to the brain,
hemorrhages in the brain[.]" According to Dr. Croft, the fall also caused O'Banion to suffer
from a coup-contrecoup, meaning that O'Banion's brain "struck one side of the skull,
bounced back, and caused damage to the opposite hemisphere." Dr. Croft opined that
O'Banion was improving before the fall because he had been moved from the intensive care
unit to the floor, and he had been removed from an intra-aortic balloon pump.

 Dr. Croft testified that after the fall, O'Banion "was noted to be obtunded; that is, his
level of consciousness was decreased; and he was transferred to the intensive care unit." 
According to Dr. Croft, O'Banion's bedridden condition after the fall subjected him to
developing other complications, such as pneumonia, infections, blood clots, or decubitus
ulcers. Dr. Croft testified, "it's difficult to state exactly what the final cause of death was. 
I think that the intra[]cerebral hemorrhage, or the head injury, was the mechanism that
eventually led up to his death." According to Dr. Croft, but for O'Banion falling and hitting
his head, he would not have died on December 22, 2002.

 Dr. Croft testified that there was no reason O'Banion "wouldn't have continued to
improve, at least in the immediate future, if it wasn't for that fall." Dr. Croft opined that the
head injury "led to a number of medical complications which eventually caused [O'Banion's]
death[.]" Dr. Croft further explained, "it's difficult to tell exactly what the exact final
mechanism was, whether it could have been sepsis, which is infection in the blood, or
aspiration pneumonia, or urinary tract infection, or blood clots. It's difficult to tell what the
final actual cause of death was because there weren't really interventions, quite appropriately,
done to determine that." According to Dr. Croft, O'Banion's intracerebral hemorrhage "may
not have caused his death immediately . . .; but over time, given the other complications that
are apt to develop, it . . . very well could have led to death." Dr. Croft testified that the fall
led to "medical deterioration, which led to [O'Banion's] death." Dr. Croft testified that
O'Banion was being treated with a blood thinner (Coumadin) before the fall, but the fall
necessitated discontinuation of the Coumadin, thereby increasing O'Banion's risk of blood
clots, heart attack, stroke, and atrial fibrillation. Dr. Croft also explained that putting
O'Banion on a ventilator after the fall increased his risk of developing pneumonia and other
respiratory problems.

 On cross-examination, Dr. Croft testified that he would defer to a cardiologist
regarding the significance of O'Banion's congestive heart failure. Dr. Croft also explained
that O'Banion's treating cardiologist had predicted that O'Banion's life expectancy would
be shortened, and Dr. Croft testified that the bleeding in O'Banion's brain "was not the direct
cause of his death." Dr. Croft opined that O'Banion died from a secondary complication of
the brain hemorrhage; however, he could not state what complication directly caused
O'Banion's death. Dr. Croft testified that he could not rule out heart failure, myocardial
infarction, or arrhythmia as the cause of O'Banion's death. Dr. Croft testified he did not
believe an autopsy was necessary to determine the cause of O'Banion's death, but he
admitted that an autopsy could have ruled out other potential causes.

 Dr. Michael Smith, O'Banion's treating cardiologist, testified that when O'Banion
was admitted to Christus with an acute myocardial infarction and severe pulmonary edema, 
he performed an emergency cardiac catheterization on O'Banion. Dr. Smith treated
O'Banion with an intraortic balloon pump, blood pressure medication, and a blood thinner. 
Dr. Smith explained that O'Banion suffered from "significantly reduced function of the left
ventricle[]" because portions of the left ventricle had died as a result of the heart attack. 
O'Banion also suffered from mitral valve regurgitation. Dr. Smith testified, "it would have
surprised me if he would have left the hospital alive based on his heart situation." Dr. Smith
also explained that although O'Banion's condition had improved, his heart did not really
improve.

 According to Dr. Smith, O'Banion's dead heart muscle could not be treated with
cardiac rehabilitation, and he did not expect O'Banion's heart function to significantly
improve. Dr. Smith explained, "I think that [O'Banion] was at - - a setup candidate for
recurrent admissions to the hospital with heart failure if he survived; and he was certainly at
risk for the development of . . . sudden cardiac death, which is ventricular arrhythmias and
dying suddenly." When asked whether being bedridden adversely affected O'Banion's
cardiac recovery, Dr. Smith testified, "Being bedbound would set him up [for] other
problems, such as blood clots and things of that nature, that aren't specifically directed to the
heart per se, but it would have certainly changed his clinical course." Dr. Smith also testified
that stopping the blood thinner put O'Banion at risk of developing blood clots. According
to Dr. Smith, head trauma does not cause congestive heart failure. Dr. Smith testified that
being placed on a ventilator could contribute to the development of pneumonia. When asked
whether the fall contributed to O'Banion's death, Dr. Smith explained, "If I were signing the
death certificate, it would have to be listed . . . at least in that [sic] contributing factor." Dr.
Smith testified that the fall contributed to O'Banion's condition, but "[w]hether or not it led
directly to the demise, I don't know." Dr. Smith testified that heart failure could have been
the cause of O'Banion's death.

 Cardiologist Dr. Frank Meissner testified that he was retained "to look at this case
from the standpoint of the patient's cardiovascular prognosis of death prior to his fall and try
to give some estimate of what I thought the likelihood would be that he would
survive to . . . to one year, since he survived to discharge." According to Dr. Meissner,
O'Banion's risk of dying within one year was thirty to forty percent. Dr. Meissner
characterized O'Banion's heart attack as "a moderate sized infarct." Dr. Meissner explained
that O'Banion's left ventricular pressure was elevated, and he had mitral regurgitation and
elevated systolic pressures. According to Dr. Meissner, O'Banion's heart muscle function
had begun to improve after the insertion of an intra-aortic balloon pump, O'Banion was
removed from the ventilator, and his congestive heart failure was responding to treatment.
However, Dr. Meissner also testified that O'Banion suffered from atrial fibrillation sometime 
before the fall. Dr. Meissner further testified, "I think it's uncontroversial to say that he was
showing clinical improvement over the period of time until the fall." Dr. Meissner also noted
that Dr. Smith had prescribed physical therapy for O'Banion, and that fact "says something
fairly significant about Dr. Smith's assessment of the patient's clinical trajectory and how
he thinks he's doing because you don't prescribe physical therapy for people that are not
improving."

 According to Dr. Meissner, as a result of the fall, O'Banion was no longer a candidate
for an implantable cardio defibrillator ("ICD"). Dr. Meissner explained that ICDs "make a
big difference in these kind of patients in terms of chance of arrhythmic death." Dr.
Meissner testified that an ICD "would have influenced [O'Banion's] mortality somewhat;
and because of the fall, he no longer was a candidate because he didn't have the neurologic
function to justify . . . that intervention." Dr. Meissner also explained that O'Banion's
bedridden status after the fall was "just not a good state to be in with a bad . . . heart."
According to Dr. Meissner, because O'Banion survived the heart attack and was able to meet
his treating doctor, he had a "better than even chance of being alive at a year."

 On cross-examination, Dr. Meissner testified that he was not asked to provide an
opinion on the actual cause of O'Banion's death, and he did not review the necessary records
to make that determination. Dr. Meissner testified that he was at least fifty-one percent
certain that O'Banion's heart condition declined due to his immobility after the fall, and he
admitted that since his deposition, he had changed his opinion regarding that issue based on
new data presented to him.



Issues on Appeal


 In issue one, Christus asserts the evidence was legally and factually insufficient to
support the jury's verdict that Christus's negligence proximately caused O'Banion's death. 
In issues two and three, Christus argues the trial court abused its discretion in denying its
motions to exclude the causation testimony offered by Drs. Croft and Udonta. Because
Christus's legal sufficiency argument, if sustained, would result in rendition of a judgment
that appellees take nothing, we address this portion of issue one first. See Glover v. Tex.
Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981); Tex. R. App. P. 43.3.

Standard of Review


 When an appellant attacks the legal sufficiency of an adverse finding on an issue on
which it does not have the burden of proof, it must demonstrate that there is no evidence to
support the adverse finding. Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). In
reviewing a no evidence point, we consider only the evidence and inferences that tend to
support the finding and disregard all contrary evidence and inferences. Bradford v. Vento,
48 S.W.3d 749, 754 (Tex. 2001); Cont'l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450
(Tex. 1996); Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994). We must credit
favorable evidence if reasonable jurors could, and we must disregard contrary evidence
unless reasonable jurors could not. City of Keller v. Wilson, 168 S.W.3d 802, 807 (Tex.
2005). If there is more than a scintilla of evidence to support the finding, the evidence is
legally sufficient. Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex. 1993). When
the evidence of a vital fact is "so weak as to do no more than create a mere surmise or
suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no
evidence." Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004) (quoting Kindred
v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).

Pertinent Law


 In a medical negligence case, the plaintiff must prove by a preponderance of the
evidence that, within a reasonable medical probability, the allegedly negligent act or
omission proximately caused the harm alleged. Kramer v. Lewisville Mem'l Hosp., 858
S.W.2d 397, 399-400 (Tex. 1993); Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508, 511
(Tex. 1995). The two components of proximate cause are cause-in-fact and foreseeability. 
Marathon Corp. v. Pitzner, 106 S.W.3d 724, 727 (Tex. 2003); Arlington Mem'l Hosp.
Found., Inc. v. Baird, 991 S.W.2d 918, 922 (Tex. App.--Fort Worth 1999, pet. denied). In
medical malpractice cases, "[a]s is true in other types of negligence cases, the ultimate
standard of proof on the causation issue is whether, by a preponderance of the evidence, the
negligent act or omission is shown to be a substantial factor in bringing about the harm and
without which the harm would not have occurred." Kramer, 858 S.W.2d at 400; see also
Park Place Hosp., 909 S.W.2d at 511.

 Likewise, in actions filed under the Wrongful Death Statute, the plaintiff must prove
that the alleged negligence proximately caused the death. See Tex. Civ. Prac. & Rem. Code
Ann. § 71.002 (Vernon 1997); Kramer, 858 S.W.2d at 404; Sisters of St. Joseph of Texas,
Inc. v. Cheek, 61 S.W.3d 32, 37 (Tex. App.--Amarillo 2001, pet. denied). "[T]he plaintiff
must establish a causal connection beyond the point of conjecture; proof of mere possibilities
will not support the submission of an issue to the jury." Duff v. Yelin, 751 S.W.2d 175, 176
(Tex. 1988). Furthermore, unless the doctrine of res ipsa loquitur applies, a plaintiff
generally must provide expert testimony to prove that the alleged medical negligence
proximately caused the injury. (1) Linan v. Rosales, 155 S.W.3d 298, 302-03 (Tex. App.--El
Paso 2004, pet. denied); see also Roark v. Allen, 633 S.W.2d 804, 809 (Tex. 1982) ("Expert
testimony is necessary when the alleged negligence is of such a nature as not to be within the
experience of the layman."). In addition, Texas law does not recognize the loss of a chance
of survival or cure as evidence of proximate cause in medical malpractice cases. Kramer,
858 S.W.2d at 404-07; Hodgkins v. Bryan, 99 S.W.3d 669, 675 (Tex. App.--Houston [14th
Dist.] 2003, no pet.); Bradley v. Rogers, 879 S.W.2d 947, 955-57 (Tex. App.--Houston [14th
Dist.] 1994, writ denied). Furthermore, a plaintiff must rule out other plausible causes of the
injury. Merrell Dow. Pharms., Inc. v. Havner, 953 S.W.2d 706, 720 (Tex. 1997) (citing E.I.
du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 559 (Tex. 1995)). 

Application of the Law to the Facts


 Dr. Udonta testified that O'Banion's "mortality rate" after the fall was high, and he
opined that O'Banion's fall and resultant head injury "contributed to his death possibly." Dr.
Udonta also testified that because of O'Banion's pre-existing medical problems, O'Banion's
brain injury would have made a difference. Dr. Udonta merely opined that the fall
contributed to O'Banion's death and decreased O'Banion's likelihood of surviving. Such
testimony does not constitute legally sufficient evidence of proximate cause. Cheek, 61
S.W.3d at 36-37 (finding a physician's testimony that the alleged negligence "caused or
contributed to" the decedent's death is legally insufficient); Kramer, 858 S.W.2d at 404-07
(Texas law does not recognize the loss of a chance of survival as evidence of proximate
cause in medical malpractice cases.); see generally Bradley, 879 S.W.2d at 958 ("Testimony
in the abstract about mortality rates is not evidence of proximate cause. . . .").

 Dr. Croft testified that O'Banion was obtunded after the fall, and O'Banion's
bedridden condition subjected him to various secondary complications, including pneumonia,
infections, blood clots, or decubitus ulcers. According to Dr. Croft, the head injury "led to
a number of medical complications which eventually caused [O'Banion's] death[.]" Dr.
Croft opined that intracerebral hemorrhage "was the mechanism that eventually led up to
[O'Banion's] death[,]" but he also testified, "it's difficult to state exactly what the final cause
of death was." Dr. Croft testified that the hemorrhage did not directly cause O'Banion's
death; rather, the fall led to a "medical deterioration," that other complications were likely
to develop as a result, and that such complications "very well could have led to death."

 Although Dr. Croft testified that if O'Banion had not fallen, he would not have died
on December 22, 2002, Dr. Croft testified that the bleeding in O'Banion's brain "was not the
direct cause of his death[,]" and he did not offer an opinion regarding what particular
secondary complication led to O'Banion's death. Dr. Croft admitted that he could not rule
out heart failure, myocardial infarction, or arrhythmia as causes of O'Banion's death. See
Havner, 953 S.W.2d at 720. Furthermore, although Dr. Croft noted that the fall necessitated
discontinuation of O'Banion's Coumadin, he did not state the cessation of the Coumadin
therapy caused O'Banion's death. Likewise, although Dr. Croft testified that putting
O'Banion on a ventilator increased his risk of developing pneumonia and other respiratory
problems, he did not testify that O'Banion developed such complications, or that such
complications caused O'Banion's death. Dr. Croft's testimony that O'Banion's fall caused
an unidentified secondary complication, and that such a complication caused his subsequent
death, is legally insufficient evidence of proximate cause. See Kramer, 858 S.W.2d at 400
(The alleged negligent act must be shown to be a substantial factor in bringing about the
harm and without which the harm would not have occurred.); Duff, 751 S.W.2d at 176 (Proof
of mere possibilities does not support submission of the issue of causation to the jury.).

 Dr. Smith testified that he would have been surprised if O'Banion had "left the
hospital alive based on his heart situation." Dr. Smith also explained that O'Banion was at
risk of sudden cardiac death. Dr. Smith opined that O'Banion's bedridden status after the
fall and the discontinuation of the Coumadin made O'Banion prone to other complications
and would have changed O'Banion's clinical course. Dr. Smith also testified that being
placed on a ventilator made O'Banion susceptible to pneumonia. Dr. Smith testified he
believed the fall contributed to O'Banion's condition, but he did not know whether the fall
led directly to O'Banion's death. Although Dr. Smith identified the cessation of the
Coumadin and O'Banion's placement on a ventilator as increasing O'Banion's risk of
complications, Dr. Smith did not identify what such complication, if any, caused O'Banion's
death. Dr. Smith testified that before the fall, O'Banion was at risk of death due to his heart
condition, and he did not rule out cardiac events (independently of the fall) as the cause of
O'Banion's death. See Havner, 953 S.W.2d at 720. For these reasons, Dr. Smith's testimony
does not provide legally sufficient evidence of proximate cause. See Kramer, 858 S.W.2d
at 400; Duff, 751 S.W.2d at 176; Cheek, 61 S.W.3d at 36-37.

 Dr. Meissner testified that O'Banion had only a thirty to forty percent risk of dying
within one year, and O'Banion was improving until the fall. Dr. Meissner testified that as
a result of the fall, O'Banion was no longer a candidate for an ICD; however, he did not
testify that if an ICD had been implanted, O'Banion would not have died. Rather, Dr.
Meissner testified that an ICD "would have influenced [O'Banion's] mortality somewhat[.]"
Dr. Meissner also testified that he was not asked to provide an opinion regarding the cause
of O'Banion's death, and he did not have the necessary records to make such a
determination. Dr. Meissner testified he was at least fifty-one percent certain that
O'Banion's heart condition declined due to his immobility after the fall, but he did not testify
that O'Banion's heart condition caused his death, nor did he testify that O'Banion would not
have died if he had not fallen. See Cheek, 61 S.W.3d at 35 (Plaintiffs must prove that the
alleged negligence was a substantial factor in bringing about the harm, and without which
negligence the harm would not have occurred.).

 Because Dr. Meissner did not testify that the fall caused O'Banion's death, his
testimony does not provide legally sufficient evidence of proximate cause. See id.; see also
Kramer, 858 S.W.2d at 404-07 (Texas law does not recognize the loss of a chance of survival
as evidence of proximate cause in medical malpractice cases.); Bradley, 879 S.W.2d at 958
(Testimony in the abstract about mortality rates is not legally sufficient evidence of
proximate cause.); Cheek, 61 S.W.3d at 36-37 (Testimony that alleged negligent act "caused
or contributed to" death is legally insufficient.).


Conclusion


 Having found that none of the expert testimony offered by appellees provided legally
sufficient evidence of proximate cause, we sustain the legal sufficiency argument in
Christus's first issue, and we render judgment that appellees take nothing from Christus. 
Because of our disposition of Christus's legal sufficiency argument, we need not address
Christus's factual sufficiency argument or issues two and three.

 REVERSED AND RENDERED.




 

 STEVE McKEITHEN

 Chief Justice



Submitted on March 8, 2007

Opinion Delivered June 21, 2007


Before McKeithen, C.J., Gaultney and Kreger, JJ.
1. In this proceeding, the parties do not contend that the doctrine of res ipsa loquitur
applies.