# IN THE SUPREME COURT OF TEXAS

════════════

No. 12-0289

════════════

HMC HOTEL PROPERTIES II LIMITED PARTNERSHIP AND
HOST HOTELS & RESORTS, L.P., F/K/A/ HOST MARRIOTT, L.P.,
PETITIONERS,

v.

KEYSTONE-TEXAS PROPERTY HOLDING CORPORATION,
RESPONDENT

════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

════════════════════════════════════════════════════

**Argued February 4, 2014**

JUSTICE BROWN delivered the opinion of the Court.

This case involves the attempted sale of two pieces of real estate in downtown San Antonio—the Rivercenter Mall and the ground beneath the San Antonio Marriott Riverwalk hotel. After a deal to sell the properties fell through, the seller sued its tenant—the hotel owners—over actions the seller believed killed the deal. The jury found liability, and awarded damages for slander of title and tortious interference with a contract. Among other issues, the hotel owners argue there is no evidence their actions caused the sale's demise. We agree and, for the reasons below, reverse the court of appeals' judgment.

The Rivercenter Mall and the ground underneath the Marriott Riverwalk hotel were both owned by Keystone–Texas Property Holding Corporation, an investment arm of the Pennsylvania Public School Employees Retirement System. Keystone leased the hotel land to the petitioners (collectively, "Host"), who own and operate the Marriott Riverwalk.

In 2004, Keystone put the two properties up for sale. New York investor Ben Ashkenazy soon emerged as a potential buyer at a price of $166 million for the two properties. Host was not aware the hotel land was for sale until January 7, 2005, when Keystone sent Host notice of the pending sale in an effort to comply with section 14.02 of Host's lease. Section 14.02 provides:

> If Landlord decides to sell the Leased Premises to a third party, Landlord will give Tenant notice of such decision and afford Tenant a reasonable period of time as specified in such notice, but in no event more than ninety (90) days, in which to attempt to negotiate a mutually satisfactory agreement for purchase of the Leased Premises.

Keystone stated it was selling the hotel land to Ashkenazy Acquisition Corporation for $65 million and that the deal would close within 75 days. Keystone invited Host to make an offer for the property, but also requested that Host waive its rights under section 14.02 so the sale to Ashkenazy could go forward.

In a letter dated February 11, Host informed Keystone it may be interested in buying the land and was not ready to waive its rights under the lease. But Host never made an offer. Moreover, on March 17, a Host representative emailed Keystone to say the requested waiver was "close to being signed and sent back." Host further requested that Keystone set up a meeting between Host and Ashkenazy to discuss the potential buyer's plans for the property.

At least two such meetings took place, after which Host claims it became suspicious of the $65 million offer for the hotel land, which Host valued at no more than $35 million. Host suspected—and argued extensively at trial—that in allocating the $166 million purchase price between the two properties, the price of the hotel land was inflated to discourage Host from making an offer on the property. Host then changed course, and on April 18 sent Keystone a letter that made clear a waiver would not be coming. In the letter, Host accused Keystone of failing to comply with its obligation under the lease to extend Host a "first right of negotiation" because Keystone "apparently [had] already negotiated a deal with a third party." Host demanded Keystone extend a new 90-day negotiation period that would "focus on establishing a fair market price for the Leased Premises and not on the terms of any deal or proposed transaction that Keystone prematurely negotiated with any third party."

By the time Host sent its letter, the deal for the sale of the two properties had been split into two pieces and the mall deal had closed. But the hotel deal never did. Host sued Keystone for breach of the lease and unsuccessfully sought a temporary injunction to block the sale. Keystone counterclaimed for slander of title and tortious interference with a contract, arguing that Host's letter, which was passed to the proposed title insurers, scuttled the sale.

At the conclusion of the trial, the jury found for Keystone on all issues. The trial court awarded Keystone $39 million in actual damages, but granted Host's motion for judgment notwithstanding the verdict on the jury's award of $7.5 million in punitive damages. On appeal, the court of appeals affirmed the actual-damages award and reinstated the punitive damages.

Host presses a handful of arguments in its appeal to this Court. Among them is the contention that its actions did not cause the sale to fall through. Instead, the sale foundered because Ashkenazy was unable to secure title insurance. The two title insurers involved in the deal both required Host to waive in writing its section-14.02 rights before they would issue "clean" title policies—that is, policies without coverage exceptions for claims arising under section 14.02. Although Keystone asked Host for such a waiver, Host did not provide one, and it is undisputed that the lease did not obligate Host to do so. Host argues that because the title insurers required a waiver both before and after Host sent its April 18 letter, the letter could not have caused the deal's collapse. At most, it simply communicated that a waiver was not forthcoming. The outcome would have been the same regardless of how Host communicated its position to Keystone, or if it had said nothing at all.

In reviewing a verdict for legal sufficiency, we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006). Evidence is legally insufficient when (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharm. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

The court of appeals summarized testimony of several witnesses, many who blamed Host's letter for killing the deal, and concluded the evidence was sufficient to support the jury's findings that Host's letter proximately caused the deal's demise. The court of appeals did not, however, point

4

to any evidence showing how the ultimate outcome would have been different had Host not sent the letter.

The liability questions were submitted to the jury under a proximate-cause standard, which includes two elements: cause in fact and foreseeability. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. and Research Corp.*, 299 S.W.3d 106, 122 (Tex. 2009). The cause-in-fact element is satisfied by proof that (1) the act was a substantial factor in bringing about the harm at issue, and (2) absent the act ("but for" the act), the harm would not have occurred. *Id*. These elements cannot be established by mere conjecture, guess, or speculation. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).

Here, Host argues no evidence supports "but-for" causation. Put another way, no evidence shows the outcome would have been different if Host had not sent its letter. Host's position is supported by title-commitment letters and testimony from employees of Fidelity National Title and Land America, the two title insurers that worked on the deal, both of which required section-14.02 waivers. The "Schedule C" provisions of Fidelity's title commitment required that it "be furnished with a duly executed and acknowledged Waiver Of Right Of Negotiation by [Host] regarding the provisions under Section 14.02 of the [lease] in connection with the proposed sale." Land America's title commitment contained a similar provision.

Sam Smith, the Fidelity account executive who worked the deal, testified that "from the very beginning of the transaction we had said: 'Hey, someone has to give us a waiver of that right of first refusal for us to remove it from the policy'" and that "unless we get a waiver there's really no way to remove that lease from Schedule C of the policy." Smith testified he assumed a waiver would be

5

forthcoming. Upon receiving a copy of Host's letter, however, Smith testified he "thought that we would not get a waiver from [Host] and that we would have to take exception to that lease when it closed." When asked if the insurers' decision not to "insure around"—or, issue a clean policy without a section-14.02 exception—was made "in light of the objection [Host] sent," Smith replied that Fidelity was "going to have the issue regardless" and that it "still needed the waiver on Schedule C."

Smith also testified that while title insurers have discretion to remove exceptions to a policy and "insure around" lease provisions like section 14.02, doing so here was never a possibility:

| | |
|---|---|
| Counsel: | Did you ever consider issuing the policy around Section 14.02 based on the expiration of the 90-day negotiation period? |
| Smith: | I'm sure we considered it, but it was never even close to a valid option. I mean, we would never—we would never be allowed to write that policy without that waiver. |
| Counsel: | Okay. So from the beginning to the end, the position of Fidelity was, we simply want the waiver and we're not prepared to issue the title policy without it; is that right? |
| Smith: | Yeah. As I stated, even in our original commitment. |
| Counsel: | And that was the position of Fidelity both before and after the April 18th letter, correct? |
| Smith: | Yes. |
| Counsel: | No change at all? |
| Smith: | No change at all. |

Land America, which was also issuing a policy but apparently following Fidelity's lead, also consistently declined to insure around section 14.02 without a waiver. Jennifer Maxwell, Land America's "closer" for the deal, testified that Land America would not have "gone it alone" on the transaction, and that "if Fidelity declined, Land America was going to decline." Maxwell further

6

testified that Land America's position "all along" was that a waiver was required to issue a clean policy.

The terms of the deal between Keystone and Ashkenazy independently required a waiver as a condition for closing. Included in the deal's Agreement for Sale and Purchase was a list of "Conditions Precedent to the Closing for the Benefit of the Buyer," one of which was delivery of Host's waiver of its section-14.02 rights. After the deal collapsed, Ashkenazy sent Keystone a letter claiming Keystone "failed to satisfy the 'Buyer Closing Conditions,'" including delivery of a "Waiver of First Right of Negotiation as required by Section 5.2.8 of the Agreement," among other documents. Ashkenazy further wrote that he had "previously advised Seller that the aforesaid documents were essential to Buyer's performance under the Agreement and Buyer has previously advised Seller in both letters and numerous emails that Buyer was unable to waive any of the Buyer Closing Conditions."

Ashkenazy never complains of, or even mentions, Host's letter. Rather, he blames Keystone's failure to deliver documents required by the agreement, all of which only Host could execute. But Keystone never argues Host was under any obligation to provide a waiver. To the contrary, e-mails from its attorney, Laura Sims, demonstrate the opposite. In an e-mail to Land America's Jennifer Maxwell, Sims wrote: "We are of course going to ask Purchaser to waive the condition re: written waiver from [Host]—but perhaps more to the point, as written, the obligation is to provide said waiver as the Lease requires—which is frankly none." Separately, Sims wrote to David Kriss, Ashkenazy's attorney for the transaction: "But, I'd like to re-emphasize—SECTION 14.02 DOES NOT REQUIRE A WRITTEN WAIVER BY TENANT."

7

Ultimately, Keystone went forward with the sale on the gamble that it could persuade Host to get on board. On March 5, John Gerdes, Keystone's asset manager, said in an e-mail to David Burke, Host's asset manager, that Keystone was "pressing forward under the assumption we will have a response shortly." As closing drew near, however, the parties to the deal grew apprehensive over Host's waiver. Gerdes wrote to Burke again on March 10, telling him, "We are proceeding to a closing date in the next two weeks and would like to finalize the [Host] waiver." Burke responded to Gerdes in a March 17 e-mail that the waiver "is close to being signed and sent back."

But on April 13, Gerdes wrote to Burke: "I haven't seen or heard anything from [Host] and am being pressed on all sides." During this time, Ashkenazy's attorney, David Kriss, wrote to Gerdes that Ashkenazy was "getting a lot of pressure from our lender and need[s] to know where [Host] stands" and that "[o]ur loan is structured so that as soon as we get the [Host] waiver we can close that piece quickly." Ashkenazy also personally e-mailed Gerdes with inquiries about the waiver.

Host's letter no doubt had a significant effect on the sale. It informed everyone involved in the deal that an anticipated and necessary waiver was not coming after all. This was a significant shift in Host's position that immediately cast doubt on whether the sale could close. But no one argues Host was obligated to provide the waiver, or that Host did not have the right to change its mind. Host clearly communicated its new position in the letter, but there is no evidence the outcome would have been any different had Host said nothing at all. At some point before closing, the title insurers would have insisted on the waiver, and Keystone, powerless to force Host's hand, would

8

have been unable to produce it. The deal failed not because of a letter, but because Keystone was unable to convince Host to voluntarily relinquish its rights.

Keystone agrees the deal collapsed when the title companies refused to issue "clean" policies, but argues there is "ample evidence" the title insurers would have agreed to "insure around" section 14.02 if Host had not sent its letter. At its core, Keystone's argument presupposes that if Host had behaved differently, the title insurers could have been convinced to give up their waiver demand. Keystone points out Host was a "non-objecting tenant" that had represented it would sign the waiver, and had indeed already executed a "Tenant Estoppel Certificate" stating Keystone had "fully performed and complied with" the lease. Host's "completely contrary position," assumed days before closing, "escalated the title companies' risk and foreclosed all attempts to 'insure around' section 14.02." Put another way, Keystone seems to suggest it is not simply Host's refusal to provide a waiver, but the dramatic fashion in which it changed its mind days before closing that increased the perceived risk of insuring around section 14.02.

The testimony Keystone cites certainly demonstrates the dramatic effect of Host's letter. Keystone's property manager called it "really devastating" and testified it "blew up the deal." Keystone's attorney for the transaction called it a "suckerpunch" that came as "a tremendous surprise" and was "disorienting and very disruptive." The deal's broker considered it a "bomb that was thrown in the deal at the last minute." And Ashkenazy's attorney said he knew the closing "was in jeopardy" when he saw the letter.

The testimony is powerful, but it is not evidence the outcome would have changed had Host revealed its position earlier or in a less dramatic fashion. Host's change of heart may have come as

9

a surprise, but no evidence demonstrates that the title insurers would have been more inclined to abandon their consistent waiver demand if Host had behaved differently.

Keystone points to additional testimony that it maintains speaks more directly to the impact of Host's letter on the title insurers' decision not to insure around section 14.02. Laura Sims, Keystone's attorney for the transaction, opined that the letter "made a claim of wrongdoing that rachets up risk" for the title insurers and made it "much more difficult for them to write a policy." Sims also testified she believed that without Host's letter, the title insurers would have insured around section 14.02 after the 90-day notice period had expired. Similarly, Ashkenazy's attorney for the transaction testified that "obviously there's a difference between [Host] sitting back and doing nothing versus the letter that they sent." Host's own senior vice president, Keystone argues, admitted the letter "reduce[d] the odds" of closing the deal. But in the end, all of this testimony is simply speculation about what the title insurers might have done had Host handled itself differently. Testimony based on nothing but speculation is evidence of nothing at all.

Turning to the title insurers, Keystone focuses on Smith's testimony that Fidelity explored the option of insuring around section 14.02 without a waiver. Smith testified Fidelity was "trying to think if there was a way to do that" and confirmed the issue was discussed internally. He further acknowledged that Host's letter was "a substantial contributing factor" to the decision not to insure around section 14.02 without a waiver. And when asked if "it was the existence of the letter itself" that compelled Fidelity's decision, rather than whether Host's position in the letter was correct, Smith testified, "Yes.  Most definitely." Similarly, Land America's Jennifer Maxwell agreed the letter had a "substantial effect" and testified it "changed things from Land America's standpoint."

10

Keystone argues in its brief that "[i]f the absence of a waiver was outcome-determinative, Smith immediately would have told the parties that the issuance of a 'clean' title policy was off the table" and that exploring the possibility of insuring around section 14.02 "would have been an unnecessary and fruitless exercise."

In sum, Keystone's causation argument concerning the title insurers is that (1) insuring around section 14.02 could not have been impossible because the title insurers discussed the possibility after receiving Host's letter, and (2) Host's letter was an important factor the title insurers considered before refusing to insure around section 14.02. We address each component of this argument in turn.

First, exploring the option of "insuring around" section 14.02 is not evidence that doing so was ever truly possible. The impossible does not become possible merely because someone wishes or works in vain to make it so. The title insurers consistently demanded a waiver, and no evidence shows they would have backed off that demand absent Host's letter. To the contrary, Smith testified that "we were going to have the issue regardless" and that "we would never be allowed to write that policy without that waiver." Smith testified he looked for another option after receiving Host's letter, but the fruit of his labor left him where he began. Insuring around section 14.02 "was never even close to a valid option."

At most, the testimony Keystone relies on raises the inference that the title insurers could have insured around section 14.02, not that they would have. Testimony about what the insurers might have done differently is conclusory—"[b]are, baseless opinions [that] will not support a judgment even if there is no objection to their admission in evidence." *See City of San Antonio v.*

11

*Pollock*, 284 S.W.3d 809, 816 (Tex. 2009); *see also Haynes & Boone v. Bowser Bouldin*, Ltd., 896 S.W.2d 179, 183 (Tex. 1995), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007) (testimony that a property owner could have avoided foreclosure had a tenant not vacated was "so weak as to do no more than create a mere surmise or suspicion of its existence and in legal effect, is no evidence.").

Second, the title-insurance witnesses' testimony about the effect of Host's letter on the transaction is not tantamount to testimony that the outcome would have been any different if Host had not sent its letter. Host's letter certainly had an impact on the transaction. It communicated for the first time that the anticipated waiver essential to closing the deal would not be given. But testimony that the letter was a substantial factor in bringing about harm to Keystone is only half of the cause-in-fact element. *See Akin*, 299 S.W.3d at 122. Keystone also had to show that absent Host's letter, the harm would not have occurred. *See id*. The title-insurance witnesses, however, never testified there was a possibility of a different outcome had Host not sent its letter.

Moreover, even if counsel were able to get a witness to agree to language reflecting the causation standard at issue in this case, the bare assertions of the title-insurance witnesses in response to carefully worded questions from counsel do not constitute evidence of causation. *See Jelinek v. Casas*, 328 S.W.3d 526, 538 (Tex. 2010) (quoting *Pollock*, 284 S.W.3d at 818) ("[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence."); *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999) ("But it is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not

stand or fall on the mere *ipse dixit* of a credentialed witness."). There is no "magic language" that checks the causation box in a sufficiency-of-the-evidence review. *See Schaefer v. Tex. Empr's Ins. Ass'n,* 612 S.W.2d 199, 205 (Tex. 1980).

Keystone contended at trial that Host's letter of April 18, 2005, doomed its real-estate deal with Ashkenazy, and formed the basis of Keystone's tortious-interference and slander-of-title claims. But there is no evidence that the letter proximately caused any damages to Keystone. Accordingly, we reverse the court of appeals' judgment and render judgment that Keystone take nothing.

_____
Jeffrey V. Brown
Justice

OPINION DELIVERED:   June 13, 2014

13