

# IN THE
# TENTH COURT OF APPEALS

### No. 10-14-00157-CV

**THOMAS H. SINCLAIR,**

　　　　　　　　　　　　　　　　**Appellant**

　**v.**

**ESTATE OF FERNANDO RAMIREZ AND EVA RAMIREZ, INDIVIDUALLY, AND PERSONAL REPRESENTATIVE OF THE ESTATE OF FERNANDO RAMIREZ, DECEASED, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES,**

　　　　　　　　　　　　　　　　**Appellees**

---

**From the 13th District Court
Navarro County, Texas
Trial Court No. 10-19633-CV**

---

## MEMORANDUM OPINION

---

In eight issues, appellant, Thomas H. Sinclair, challenges a jury verdict entered in favor of appellees, the Estate of Fernando Ramirez and Eva Ramirez, individually, and as personal representative of the Estate of Fernando Ramirez, deceased, and on behalf of all wrongful-death beneficiaries. Because we conclude that appellees failed to present legally-sufficient causation evidence directly connecting appellant's purported

negligence with the decedent's death, we reverse and render judgment in favor of appellant.[1]

## I. BACKGROUND

On October 1, 2008, Fernando Ramirez finished a welding job near Fairfield, Texas. While waiting for other workers to finish the project, Fernando, and two coworkers, Gregorio Aguilar and Ivan Valesquez, began drinking beer. After Fernando drank approximately fourteen to eighteen beers, Fernando and his two coworkers went to Wispers, an all-nude cabaret operated by appellant and located about fifty miles away in Mustang, Texas.

The record reflects that Fernando and his two coworkers arrived at Wispers at approximately 10:15 p.m. on October 1, 2008, and were drinking heavily throughout the evening. Upon arriving, the three paid the cover charge and went inside the club. Thereafter, Fernando purchased four private dances in a separate VIP room. After the second song in the VIP room, Fernando needed to use the restroom. The dancer, Deborah Bolton, escorted Fernando to the restroom and waited for his return. However, while waiting, Bolton informed appellant that Fernando was "handsy" during the first two songs.

After Fernando finished in the restroom, Bolton escorted him back to the VIP room. Once inside, Ramirez became aggressive with Bolton and demanded sex while exposing his genitals. Eventually, Fernando grabbed Bolton, spun her around, and tried

---

[1] Based on our resolution of this case, we dismiss all pending motions as moot.

to throw her on the couch. Bolton believed that Fernando intended to rape her. In any event, Bolton escaped and alerted appellant, who told Bolton to go to the dressing room.

Subsequently, Fernando exited the VIP room in an agitated state. Fernando approached appellant and demanded a refund for the dances. Anthony Eaglin, a patron at the club, testified that Fernando demanded a refund because: "He was expecting to get more out of [the] VIP [room] because of how much he paid for his dances. He was expecting to get a little bit more on the sexual side instead of just dances." Appellant refused to give Fernando a refund. Enraged, Fernando threw a nearby clipboard and metal box at appellant. Then, Fernando tried to punch appellant. Sensing that the situation was escalating, appellant retreated to the other end of the bar to retrieve his sjambok, a short whip that appellant kept at the club for protection.

Fernando stepped away from the bar, turned, and charged through closed, heavy wooden doors that separated the front hallway from the main club area.[2] Fernando's charge was strong enough to break the doors off their hinges and resulted in them falling onto the floor. Once in the hallway, Fernando had easy access to the area behind the bar where appellant stored cash and the club's currency used to pay dancers—Beaver Bucks. To prevent Fernando from accessing the area behind the bar, appellant rushed to the hallway. Fernando twice charged at appellant while the two were in the hallway.

---

[2] Regarding the doors, Amber Sinclair testified to the following:

I didn't, I didn't have a phone back there. I don't know what was happening. That, the door, you would have to hear it. It's a really large, very heavy door that he [Fernando] broke. It was very loud. I don't, I don't know how he even broke it. It was, I mean, about this thick, metal, heavy, very solid wood, thicker, like this . . . .

Appellant testified that he hit Fernando in the chest with the sjambok during the second charge. Seeing Fernando with his fists in the air, Jeff Ballew, the club's disc jockey for the night, came into the hallway, grabbed the back of Fernando's shirt collar, and pulled him backwards. Witnesses testified that Fernando fell backwards onto the floor of the club and appeared "stunned."

Appellant testified that Billy Haven, a club patron, asked if appellant wanted Fernando removed from the club. Appellant responded, "yes," but denied telling Haven to drag Fernando out of the club. Appellant returned to the bar, and Haven dragged Fernando by his feet out of the club and into the parking lot. After reviewing surveillance videos from the club, Captain John Hank Bailey of the Navarro County Sheriff's Office noted that Fernando appeared to be conscious and was holding his head off of the ground as Haven dragged him out of the club.

After hearing the commotion, Aguilar cashed in his Beaver Bucks, apologized to appellant for Fernando's actions, turned down appellant's offer to call the police, and went outside. Witnesses testified that Fernando was sitting up when he was in the parking lot. And when appellant came outside to confirm that everything was okay, Aguilar assured appellant that it was and dragged Fernando to Aguilar's truck. Because he failed at loading Fernando into the truck, Aguilar requested help from Valesquez, who had earlier left the club and was sleeping in Aguilar's truck. The two men dragged Fernando into the back seat and drove away.

While Aguilar drove southbound on Interstate 45, Fernando began vomiting and became unresponsive. Aguilar pulled to the side of the highway and called 911.

Responding paramedics put a breathing tube in Fernando's airway and attempted to revive him; however, Fernando was pronounced dead at the Fairfield hospital. In records admitted at trial, the emergency-room doctor noted that he believed that Fernando may have aspirated and drowned in "his vomitus."

In any event, the Justice of the Peace ordered an autopsy by the Dallas County Medical Examiner's Office. The autopsy revealed that Fernando had a blood-alcohol level between .23% and .26%—approximately three times the legal limit for driving—and an enlarged heart. The report also recounted a linear bruise on Fernando's chest, which was consistent with appellant's use of the sjambok on Fernando. Additionally, the report identified several injuries to the front and back of Fernando's head, though defense expert, David Berry Rosenfield, M.D., emphasized that the report did not state any injuries or abnormalities in Fernando's brain.[3] Nevertheless, without identifying which injury was fatal, the medical examiners concluded that Fernando died from "blunt force head injuries."

Thereafter, appellees filed a wrongful death and survivorship action against appellant, Ballew, and several other defendants, alleging a variety of negligence claims.

---

[3] In his testimony, Dr. Rosenfield noted that alcohol is a respiratory depressant; that alcohol "interferes with the respiratory system when the alcohol levels are high"; and that Fernando's high blood-alcohol level contributed to his demise. Dr. Rosenfield also opined that the autopsy report showed that Fernando's brain was normal; that there was no evidence of hemorrhaging or swelling in Fernando's brain; and that none of the subarachnoid or subscapular, subgaleal hemorrhages were lethal. Additionally, Dr. Rosenfield testified that he did not believe that Fernando's death was caused by falling backward onto the ground. On cross-examination, Dr. Rosenfield denied that the cumulative effect of appellant's, Ballew's, and Haven's actions resulted in Fernando's fatal injury.

Appellees' live pleading against appellant asserted negligence, false-imprisonment, and gross-negligence claims against appellant. This matter proceeded to trial.

As noted in the trial court's docket sheet, the first trial ended in a mistrial during voir dire. However, the second trial resulted in a verdict in favor of appellees. The jury found that Ballew and Haven were appellant's employees and were acting in the course and scope of their employment at the time of the incident. The jury also found that appellant falsely imprisoned Fernando. With respect to damages, the jury did not award Fernando damages for his pain and mental anguish. Instead, the jury awarded Fernando's wife $480,000 and each of Fernando's three children $150,000 for past and future pecuniary loss, mental anguish, and loss of companionship. Furthermore, the jury also awarded $250,000 in exemplary damages to be divided equally between Fernando's wife and children. The jury awarded 0% to Fernando's estate.

The trial court entered a judgment against appellant for $1,187,268.01, which represented the jury finding that appellant's own actions were 70% responsible for Fernando's death and that appellant was vicariously liable for each of Ballew and Haven's 10% proportionate share. Appellant moved for a judgment notwithstanding the verdict, a motion for new trial, and a motion to modify. The trial court denied appellant's motion for judgment notwithstanding the verdict, and appellant's remaining motions were overruled by operation of law. *See* TEX. R. CIV. P. 329b(c). This appeal followed.

## II.     STANDARD OF REVIEW

An appellate court may sustain a legal-sufficiency challenge only when:  (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by

rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). In determining whether there is legally-sufficient evidence to support the finding under review, we must consider the evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

### III. ANALYSIS

In his first issue, appellant contends that, among other things, the record does not contain legally-sufficient evidence with respect to proximate cause.

## A. Applicable Law

"[I]n actions filed under the Wrongful Death Statute, the plaintiff must prove that the alleged negligence proximately caused the death." *Christus St. Mary Hosp. v. O'Banion*, 227 S.W.3d 868, 874 (Tex. App.—Beaumont 2007, pet. denied) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 71.002 (West 2008); *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 404 (Tex. 1993); *Sisters of St. Joseph of Tex., Inc. v. Cheek*, 61 S.W.3d 32, 37 (Tex. 2001, pet. denied)); *see JLG Trucking, LLC v. Garza*, No. 13-0978, 2015 Tex. LEXIS 346, at *9 (Tex. Apr. 24, 2015) ("Establishing causation in a personal injury case requires a plaintiff to 'prove that the conduct of the defendant caused an event and that this event caused the plaintiff to suffer compensable injuries.'" (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995))). "[T]he plaintiff must establish a causal connection beyond the point of conjecture; proof of mere possibilities will not support the submission of an issue to the jury." *Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988); *see O'Banion*, 227 S.W.3d at 874. Moreover, unless the doctrine of *res ipsa loquitur* applies, a plaintiff generally must provide expert testimony to prove that the alleged negligence proximately caused the injury. *See O'Banion*, 227 S.W.3d at 874 (citing *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982) ("Expert testimony is necessary when the alleged negligence is of such a nature as not to be within the experience of the layman."); *Linan v. Rosales*, 155 S.W.3d 298, 302-03 (Tex. App.—El Paso 2004, pet. denied)); *see also Dickerson v. State Farm Lloyd's Inc.*, No. 10-11-00071-CV, 2011 Tex. App. LEXIS 6061, at **12-13 (Tex. App.—Waco Aug. 3, 2011, pet. denied) (mem. op.) ("In addition, the general rule has long been that expert testimony is

necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors."). Furthermore, a plaintiff must rule out other plausible causes of the injury. *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010) ("Still, if evidence presents 'other plausible causes of the injury or condition that *could* be negated, the [proponent of the testimony] *must* offer evidence excluding those causes with reasonable certainty.'" (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997) (emphasis added))); *see E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 559 (Tex. 1995)); *see also O'Banion*, 227 S.W.3d at 874.

As stated by the Texas Supreme Court, proximate cause consists of two components—cause in fact and foreseeability. *HMC Hotel Props. II Ltd. P'ship v. Keystone-Tex. Prop. Holding Corp.*, 439 S.W.3d 910, 913 (Tex. 2014) (citing *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 122 (Tex. 2009)). "The cause-in-fact element is satisfied by proof that (1) the act was a substantial factor in bringing about the harm at issue, and (2) absent the act . . . the harm would not have occurred." *Id.* (citing *Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 299 S.W.3d at 122). Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992) (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549-50 (Tex. 1985); *Mo. Pac. R.R. Co. v. Am. Statesman*, 552 S.W.2d 99, 103 (Tex. 1977)). "These elements cannot be established by mere conjecture, guess, or speculation." *HMC Hotel Props. II Ltd. P'ship*, 439 S.W.3d at 913 (citing *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)).

**B.    Discussion**

On appeal, appellees assert that expert testimony was not necessary because lay testimony and the autopsy report were sufficient to prove causation.  We disagree.

In *Guevara v. Ferrer*, the Texas Supreme Court recognized that "non-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence."   247 S.W.3d 662, 668 (Tex. 2007). However, this exception only applies when "a connection between two events . . . is apparent to a casual observer." *Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010).  The *Jelinek* Court further opined:  "When circumstantial evidence is consistent with several possible medical conclusions, only one of which establishes that the defendant's negligence caused the plaintiff's injury, an expert witness must explain why, based on the particular facts of the case, that conclusion is medically superior to the others."  *Id.* at 529.

For further clarification, Texas courts have provided examples of scenarios for when expert testimony may or may not be necessary to prove causation.  *See Guevara*, 247 S.W.3d at 668 (stating that determining causation of "certain types of pain, bone fractures, and similar basic conditions" following an automobile accident was within the competence of lay jurors); *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984) (concluding that, in a case where a previously-healthy employee suffered watery eyes, blurred vision, headaches, and the swelling of breathing passages upon exposure to leaking chemicals, lay testimony sufficed to connect the specific injury to the negligence

with no evidence of causation beyond the leaking chemicals); *see also Roark*, 633 S.W.2d at 809 (holding that "the diagnosis of skull fractures is not within the experience of the ordinary laymen" and therefore required expert testimony); *Ins Co. of N. Am. v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966) (holding that an "inference that a pre-existing tumor was activated and the deadly effects of a malignancy accelerated by an injury" was a "question of science determinable only from the testimony of expert medical professionals"); *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex. 1966) ("In determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony. There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury."); *Kaster v. Woodson*, 123 S.W.2d 981, 983 (Tex. Civ. App.—Austin 1938, writ ref'd) ("What is an infection and from whence did it come are matters determinable only by medical experts.").

Here, the autopsy report from the Dallas County Medical Examiner's Office noted that Fernando died from blunt-force head injuries. More specifically, the report identified the following injuries:

1. Blunt force head injuries:

   a. Subarachnoid hemorrhage, 4 x 2 inches, left frontoparietal.
   b. Subscalpular and subgaleal hemorrhages, central occipital and left frontoparietal.
   c. Abraded contusion, 2-1/4 x 1-1/2 inches, mid to right occipital scalp.
   d. Full thickness laceration, ½ inch, left upper lip.

2.  Other injuries:
    a.  Multiple abrasions, back.
    b.  Abrasion, 4-1/4 inches, chest.

3.  Cardiomegaly (450 grams).

The report did not disclose which injury or injuries proximately caused Fernando's death. Furthermore, appellees did not present any expert testimony to prove whether the actions of appellant, Ballew, Haven, Fernando, or Fernando's friends caused Fernando's death. Instead, appellees rely on the autopsy report findings and testimony adduced from lay witnesses at trial, which showed that Fernando charged through closed, heavy wooden doors with enough force to break them off of their hinges; that appellant struck Fernando on the chest and possibly the lip with the sjambok; that Fernando fell backward onto the club floor when Ballew pulled him down by his shirt collar; that Haven dragged Fernando out of the club by his feet; and that Fernando's friends dragged Fernando in the parking lot of the club and had difficulty loading Fernando in the truck. Additionally, the testimony and the autopsy report indicated that Fernando had been drinking excessively on the night in question and had an enlarged heart at the time of death. *See Jelinek*, 328 S.W.3d at 534 ("Unlike *Morgan*, an otherwise healthy person did not suddenly experience health difficulties following the defendant's negligent conduct when plaintiff's symptoms were reasonably attributable to the negligence and to nothing else."). In other words, the record in this case reflects that there were multiple actions taken by multiple actors that could have caused Fernando's death—none of which were ruled out by appellees. *See Havner*, 953 S.W.2d at 720; *Robinson*, 923 S.W.2d at 559; *see also O'Banion*, 227 S.W.3d at 874. Moreover, based on our

review of the record and, in particular, the autopsy report, we cannot say that the injuries Fernando sustained and the attendant cause or causes of Fernando's death are within the "general experience and common sense of laypersons . . . to evaluate the conditions and whether they were probably caused by the occurrence." *Guevara*, 247 S.W.3d at 668; *see Morgan*, 675 S.W.2d at 733; *Roark*, 633 S.W.2d at 809; *Myers*, 411 S.W.2d at 713; *Hart*, 399 S.W.2d at 792; *see also Woodson*, 123 S.W.2d at 983.

We also conclude that appellees' reliance on the autopsy report to prove proximate cause is unfounded. Several Texas courts, including this one, have concluded that medical records are legally insufficient to prove causation unless the records directly connect a defendant's negligence with the plaintiff's death—something that the autopsy report in this case does not do. *See, e.g., San Antonio Extended Med. Care, Inc. v. Vasquez*, 358 S.W.3d 685, 690 (Tex. App.—San Antonio 2011, pet. dism'd w.o.j.) ("The [autopsy report] at issue extensively reports autopsy findings from external, internal, and microscopic examination; and, as its title suggests, appears on its face to be simply a report of Dr. Levy's clinical findings. . . . Aside from stating that Med Mart failed to deliver supplies, the report is silent as to the standard of care Med Mart was to provide, how Med Mart fell short, and how that shortcoming caused Mr. Vasquez's death."); *State Office of Risk Mgmt. v. Larkins*, 258 S.W.3d 686, 692 (Tex. App.—Waco 2008, no pet.) ("Assuming, as we do, that Larkins's medical records can be considered expert testimony, her medical records do not establish causation within reasonable medical probability."); *Bogar v. Esparza*, 257 S.W.3d 354, 364 (Tex. App.—Austin 2008, no pet.) ("In essence, Dr. Adame's report is a second autopsy report, opining about the cause of Ms. Guerrero's

death without explaining who caused it or how."). Accordingly, appellees' reliance on unsupported extrapolations taken from the autopsy report amounts to no evidence regarding causation.[4] *See Vasquez*, 358 S.W.3d at 690; *Larkins*, 258 S.W.3d at 692; *Bogar*, 257 S.W.3d at 364.

Therefore, because appellees did not proffer expert testimony regarding the causation element of their wrongful-death and survivorship claims, and because we have determined that appellees' reliance on unsupported extrapolations from the autopsy report constitutes no evidence as to proximate cause, we conclude that appellees have failed to provide legally-sufficient evidence of causation in this matter. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.002; *City of Keller*, 168 S.W.3d at 807, 827; *Martinez*, 977

---

[4] During closing argument, appellees' counsel argued the following:

> Then you know they go, Mr. Snyder, goes on and on about not having a doctor. True, I don't need a doctor. I've got 11 doctors. Nobody has ever challenged the finding of these doctors, except for Dr. Rosenfield. This is what is the official word, the cause of death of Fernando Ramirez. Nobody, except in this lawsuit has ever said these doctors got it wrong. And that being the case, the argument now goes, well, they didn't say it happened inside the club. Where else would it have happened? Who else would have assaulted Mr. Ramirez? Only the people that have admitted to that. . . . Ballew, Sinclair.

In rejecting a similar argument, the Texas Supreme Court stated the following: "Care must be taken to avoid the *post hoc ergo propter hoc* fallacy, that is, finding an earlier event caused a later event merely because it occurred first. Stated simply, correlation does not necessarily imply causation." *Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010). The Texas Supreme Court has also noted that:

> This is not to say that evidence of temporal proximity, that is, closeness in time, between an event and subsequently manifested physical conditions is irrelevant to the causation issues. Evidence of an event followed closely by manifestation of or treatment for conditions which did not appear before the event raises suspicion that the event at issue caused the conditions. But suspicion has not been and is not legally sufficient to support a finding of legal causation.

*Guevara v. Ferrer*, 247 S.W.3d 662, 668 (Tex. 2007).

S.W.2d at 334; *Kramer*, 858 S.W.2d at 404; *see also O'Banion*, 227 S.W.3d at 874; *Cheek*, 61 S.W.3d at 37.  And as such, we sustain appellant's first issue.

## IV.  CONCLUSION

Having sustained appellant's first issue, we reverse the judgment of the trial court and render judgment that appellees take nothing.  *See Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 176 (Tex. 1986) (per curiam) (stating the well-settled rule that legal sufficiency or "no evidence" points require rendition in favor of the appealing party).  And because appellant's first issue affords him the greatest relief, we need not address appellant's remaining issues.  *See* TEX. R. APP. P. 47.1; *see also CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000); *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) (explaining that generally, when a party presents multiple grounds for reversal of a judgment on appeal, appellate courts should first address issues that would require rendition).

AL SCOGGINS
Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
Reversed and rendered
Opinion delivered and filed June 4, 2015
[CV06]

