ACCEPTED
01-13-00782-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
10/12/2015 12:22:05 PM
CHRISTOPHER PRINE
CLERK

### No. 01-13-00782-CV

In the Court of Appeals for the First District
Houston, Texas

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

10/12/2015 12:22:05 PM

CHRISTOPHER A. PRINE
Clerk

## BANDIER REALTY PARTNERS, LLC AND SWITCHBACK VENTURES, LLC,

Appellants,

v.

## SSC OPPORTUNITY PARTNERS, LLC,

Appellee.

On Appeal from the 215th District Court,
Harris County, Texas, Cause No. 2011-43194,
the Hon. Elaine H. Palmer, presiding

## APPELLEE'S MOTION FOR REHEARING

TO THE HONORABLE JUSTICES OF THE FIRST COURT OF APPEALS:

Comes now, SSC Opportunity Partners, LLC ("SSC") and files this *Motion for Rehearing*. In support of this Motion, SSC shows the Court the following:

This Court should grant rehearing and affirm the trial court's judgment because the evidence presented to the jury supports its finding that both Bandier Realty Partners, LLC's and Switchback Ventures, LLC's (collectively the "Bandier Defendants") tortious actions caused SSC's damages. The Court's legal-

sufficiency analysis, however, fails to account for this evidence and, instead, rests on a version of the facts and evidence that is different than the one that the jury heard and accepted. As a result, the legal-sufficiency analysis does not comply with the standards articulated by the Supreme Court and should be revised. Similarly, because evidence supports the causation finding, the Court's reliance on *HMC Hotel Properties II Ltd. Partnership v. Keystone-Texas Property Holding Corporation* is misplaced. 439 S.W.3d 910 (Tex. 2014). Ultimately, the jury heard the causation evidence and resolved any conflicts in SSC's favor. Because the Court's opinion fails to give proper deference to this result, rehearing is proper.

## A. Background.

As explained at length in SSC's brief, this case involves a real estate transaction in which Bandier Realty (and its principals), who were acting as SSC's fiduciaries, continually attempted to force their way into a deal that SSC found and put together. [SSC Br. at 1-18]. When those attempts failed, the Bandier Defendants schemed (without SSC's knowledge) to cut SSC out of the deal. [*Id.* at 8-18].

The Bandier Defendants' plan succeeded because they chased off SSC's investor, Larry Johnson. At trial, Johnson blamed his departure on two events attributable to the Bandier Defendants. [8 RR 29-31]. First, the Bandier Defendants convinced Charter Title, another SSC fiduciary, to disregard SSC's

instructions by returning Johnson's earnest money to him and providing Switchback's earnest money to the seller rather than Johnson's. [SSC Br. at 4-11]. Second, the Bandier Defendants' principals crashed a meeting between SSC, Johnson, and the seller, and made misrepresentations about their alleged participation in the deal. [*Id.* at 11-12]. As result of the Bandier Defendants' behavior, Johnson "had about all the fun he could stand on that deal" and withdrew. [*Id.* at 11-17; 8 RR 29].

The Bandier Defendants then took advantage of SSC's loss of its investor and looming contractual deadlines by fraudulently inducing SSC to sign away its interests in the deal. [SSC Br. at 12-18; 7 CR 9918]. As a result of the Bandier Defendants' actions, SSC, which put the deal together, was left with no interest in the property and Bandier's principals, who were supposed to be SSC's fiduciaries, ended up with multi-million dollar interests. [SSC Br. at 17-18].

The jury heard all of the details of the Bandier Defendants' actions, which were documented through contemporaneous emails and trial testimony. [*Id.*]. Ultimately, the jury determined that the Bandier Defendants committed a number of torts and found $15 million in damages for SSC's loss of the property, which the trial court awarded in its judgment. [7 CR 11567-69]. This Court reversed the trial court's judgment and rendered judgment for the Bandier Defendants based on its determination that SSC presented no legally-sufficient causation evidence. [Op. at

22; App. A]. Although the Court recognized that evidence supported a finding that the Bandier Defendants' actions chased off Johnson, it held that SSC failed to introduce evidence showing that Johnson would have moved forward with the deal in the absence of defendants' torts. [*Id.* at 14-20]. However, SSC presented evidence that the jury properly credited, which the Court's opinion does not mention, showing that Johnson would have continued to work with SSC to develop the property but for the Bandier Defendants' actions.

**B.    The Court's legal-sufficiency analysis does not follow *City of Keller*.**

Rehearing should be granted because the Court's legal-sufficiency analysis does not comport with the process outlined by the Texas Supreme Court in *City of Keller v. Wilson*. 168 S.W.3d 802, 807 (Tex. 2005). Specifically, the Court's opinion fails to follow *City of Keller* and its progeny because it does not review the evidence in the light most favorable to the verdict and because it omits causation evidence that supports the jury's verdict. By applying the correct standard of review to the evidence in this case, only one determination is proper—that SSC presented legally-sufficient causation evidence.

**1.    *City of Keller* requires deference to the jury's interpretation of the evidence.**

As the Court's opinion recognizes, *City of Keller* articulated the process and standards for conducting a legal-sufficiency review of a trial court's judgment.

168 S.W.3d at 807; [Op. at 11]. When reviewing the legal sufficiency of the evidence, a court must "view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* at 807; *see also Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595 (Tex. 2010). Similarly, a court should "indulge every reasonable inference that would support" the jury's finding. *Klentzman v. Brady*, 456 S.W.3d 239, 267-68 (Tex. App.—Houston [1st Dist.] 2014, pet. filed) (citing *City of Keller*, 168 S.W.3d at 822). Relevant here, a legal-sufficiency challenge to a finding fails when more than a scintilla of evidence supports the finding. *Pointe West Ctr., LLC v. It's Alive, Inc.*, No. 01-14-00779-CV, 2015 WL 5299467, at *3 (Tex. App.—Houston [1st Dist.] Sept. 10, 2015, no pet. h.) (citing *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005)); *Klentzman*, 456 S.W.3d at 268. Thus, to overcome a legal-sufficiency challenge, an appellee must only point to evidence that "rises to a level that would enable reasonable and fair minded people to differ in their conclusions." *Pointe West*, 2015 WL 5299467, at *3. The ultimate test for legal sufficiency is whether "the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.*; *see also Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010).

When conducting a legal-sufficiency review, a court also must defer to a jury's determination of conflicting evidence. *City of Keller*, 168 S.W.3d at 820 ("[C]ourts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict."). This is because the jury is the sole judge of the witnesses' credibility and any weight to give their testimony. *Id.* at 819; *see also Republic Petroleum LLC v. Dynamic Offshore Res. NS LLC*, No. 01-14-00370-CV, 2015 WL 5076700, at *6 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, no pet. h.); *Jefferson v. Helen Fuller & Assocs. Health, Inc.*, No. 01-11-00199-CV, 2012 WL 2357431, at *13 (Tex. App.—Houston [1st Dist.] June 21, 2012, pet. denied) (mem. op.) ("As the fact-finder, the jury had the sole responsibility to assess the credibility of the witnesses, and it could choose to believe or disbelieve all or part of any witness's testimony.").

### 2. The Court's opinion fails to credit evidence that the jury accepted.

Although the Court's opinion briefly mentions these principles, it fails to apply them to the evidence in this case. The Court's legal-sufficiency analysis rests on its determination that, although evidence established that the Bandier Defendants' tortious actions caused Johnson to leave the deal, SSC presented no evidence that Johnson was going to move forward with SSC to buy the property absent the defendant's actions. [Op. at 14-20]. It bases that conclusion on (1)

SSC's supposed lack of financial ability to complete the purchase; and (2) several issues with the property that allegedly would have prevented Johnson from partnering with SSC. [*Id.*]. The problem with this determination is that it ignores evidence of SSC's ability to proceed with the deal, testimony from Johnson that he would have moved forward but for the defendants' actions, and evidence establishing that the other issues did not prevent Johnson's participation in the deal. [SSC Br. at 38-45].

> **a.** **SSC had the ability to use its option with or without an investor.**

The Court's emphasis on the fact that "SSC lacked the financial ability to purchase the land for $5 million without an investor or equity partner" does not affect the legal-sufficiency analysis. [Op. at 14-15]. This is because the undisputed evidence established that SSC could have completed the purchase with an investor and that SSC actively sought investors for the project. [11 RR 99, 218-19]. Based on this evidence, the jury found, in Question 32, that SSC "ha[d] the financial capability to exercise the option . . . ." [7 CR 9923].

Moreover, the jury also heard unchallenged expert testimony that SSC had a variety of potential ways that it could monetize its interest in the deal without an investor. That testimony came from SSC's expert, Jeffrey Spilker, who explained that SSC could also have realized the value of the option by contributing the option to a joint venture or by selling the option. [10 RR 193-94]. Because SSC had

---

various avenues to exercise the option on the property, this does not negate the causation evidence.

**b.** **Johnson testified that he would have moved forward but for the Bandier Defendants' actions.**

The Court also incorrectly reaches the conclusion that "there is no evidence that Johnson intended to purchase the 101 acres, give or loan SSC the money to do so, invest in SSC, or form a joint business entity with SSC for the purpose of purchasing and developing the property." [Op. at 15-16]. This conclusion, which the Court bolsters with anecdotal testimony about issues existing with the property, ignores evidence that the jury could have credited that demonstrated Johnson's intent to move forward. Indeed, the Court's opinion fails to mention Johnson's unequivocal testimony that he would have continued forward with SSC if the Bandier Defendants had not convinced Charter to disregard SSC's instructions and return his earnest money on the property:

Q    Is it a fair statement for you to say that - - well, is it a fair statement that you would have continued to move forward had that [earnest] money not been sent back to you?

A    I think that would be a fair statement. Continuing to work on it.

[8 RR 30-31]. Similarly, Doug Britton, SSC's principal, testified that Johnson's stated reasons for leaving the deal only involved the Bandier Defendants' behavior—not other issues related to the property. [12 RR 137, 235-36].

### c. Other evidence allowed the jury to determine that Johnson would have stayed in the deal.

Instead, the Court attempts to point to evidence of other issues that would have kept Johnson from proceeding with the deal. This evidence does not change the proper outcome because the jury also heard evidence and testimony establishing that Johnson knew of the issues and moved forward anyway. To the extent that Johnson's testimony conflicted with his actions, this was a credibility issue for the jury to determine. *City of Keller*, 168 S.W.3d at 819; *Republic Petroleum*, 2015 WL 5076700, at *6; *Jefferson*, 2012 WL 2357431, at *13. Because the jury determined this issue in SSC's favor, it cannot be disregarded.

For example, the Court concludes that because SSC failed to obtain an extension of the inspection period in the earnest money contract, issues such as a "lack of utilities, drainage, rights of way, access roads, and annexation by a MUD district . . . meant that [Johnson] would not go forward with the transaction."[1] [Op. at 15]. In reality, Johnson never testified that any of these issues caused him to leave the deal. Instead, he stated that "we could have gotten comfortable with some of them without having them done if we felt like it could be done later." [8 RR 37]. Although Johnson admitted that they "weren't to that point," the only reason that they did not continue with the deal was the Bandier Defendants'

---

[1] The extension of the inspection period and the deletion of the so-called "financial-strength" provision in the earnest money contract were provisions included in the letter agreement executed with Johnson. [21 RR Ex. 116].

actions. [8 RR 29-31, 37]. Similarly, when Britton learned Johnson's reasons for leaving the deal, the inspection period and property issues were not mentioned. [12 RR 137, 230, 235-36]. Because there is no evidence that these issues played a role in Johnson's departure or prevented him from moving forward with the deal, they cannot affect the legal-sufficiency analysis.

The Court also determines that SSC presented no evidence that Johnson "would have retreated from his demand to eliminate the financial-strength condition or to extend the inspection period [in the earnest money contract]." [Op. at 19]. This statement fails to account for SSC's evidence showing that Johnson knew that the financial-strength provision would not be deleted and that no extension would be granted but that he moved forward anyway by giving SSC $32,500 that Johnson knew would become non-refundable. This is legally-sufficient causation evidence to allow the jury to infer that those provisions did not prevent Johnson from participating in the deal. *See Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 621 (Tex. 2014) ("[W]here the circumstantial evidence is not equally consistent with either of two facts, and the inference drawn by the jury is within the 'zone of reasonable disagreement,' a reviewing court cannot substitute its judgment for that of the trier-of-fact.") (quoting *City of Keller*, 168 S.W.3d at 822).

With regard to SSC's inability to obtain deletion of the earnest money contract's financial-strength provision, the evidence at trial established that Johnson knew that, at the time he gave SSC the $32,500 in earnest money, the seller "would like to have [the financials] by the end of the week if possible." [21 RR Ex. 115, 119]. Yet, Johnson continued to move forward with the deal until the Bandier Defendants interfered. Britton gave similar testimony:

> Q      Well, you didn't get . . . a deletion of the financial strength provision.
>
> A      Larry Johnson in a phone call that day asked me to extend it throughout the week. I got that, and then we had all of the events that took place this week.

[12 RR 189]. Similarly, Johnson never testified that SSC's inability to obtain deletion of the financial-strength provision caused him to leave the deal or that it would have prevented him from going forward. This allowed the jury to determine that the financial-strength provision did not prevent Johnson from moving forward.

The jury also heard evidence that allowed it to determine that SSC's inability to obtain an extension of the inspection period did not affect Johnson's participation in the deal. Although the Court's opinion states that "[t]here is no evidence in the record that Johnson abandoned [his] demands [for an extension of the inspection period]," the evidence established that Johnson knew that no extension would be given at least one week before he gave SSC the $32,500. [Op. at 16; 8 RR 18-19, 21, 37-39; 20 RR Ex. 89-90]. Despite this knowledge, Johnson

gave Britton $32,500 in earnest money that Johnson knew would become non-refundable. [8 RR 21-22, 24; 20 RR Ex. 85]. After giving SSC the earnest money, Johnson continued to work on the deal. [8 RR 18-19, 23, 31; 21 RR Ex. 119, 132, 147-48, 150-51]. In fact, at no time did Johnson ever tell Britton or the seller that he would not move forward without an extension. [8 RR 18-19, 23]. It was not until after the Bandier Defendants' actions at the December 1 meeting that Johnson finally decided to withdraw. [8 RR 39-40]. Moreover, Britton testified that, while Johnson initially required an extension to move forward, he later "changed his mind" on that issue. [12 RR 128]. Given this evidence, the jury properly could have determined that the inspection period did not play a role in Johnson's departure or prevent him from moving forward.[2]

The Court's opinion casts this evidence aside by concluding that Johnson's $32,500 was a loan secured by a promissory note and was thus "not at risk." [Op. at 16]. Whether or not Johnson's money was at risk does not affect the analysis. The jury heard evidence that Johnson, with full knowledge that the seller would not meet his demands to delete the financial-strength provision or extend the inspection period, continued to move forward with the SSC deal. This evidence created an issue for the jury to determine—Johnson's intent—which it resolved in

---

[2] Although the Court's opinion states that Johnson's "testimony unequivocally showed that he would not proceed with the deal without an extension of the inspection period," it does not provide any such testimony. [Op. at 16-17].

SSC's favor. A reasonable juror could credit Johnson's actions and testimony, while disregarding any conflicting testimony, to conclude that Johnson would have continued with the deal without an extension, deletion of the financial-strength provision, or resolution of the other issues. Because the evidence allowed the jury to make that finding, this Court cannot set it aside. *City of Keller*, 168 S.W.3d at 827.

### 3. The *HMC Hotel Properties* decision does not control the outcome in this case.

The Court's opinion also relies upon the Supreme Court's recent *HMC Hotel Properties* decision to support its legal-sufficiency holding. [Op. at 17-19]; 439 S.W.3d at 910. The *HMC Hotel Properties* decision, which involves very different facts, offers no applicable analysis. In *HMC Hotel Properties*, the hotel (referred to as "Host") leased the Riverwalk hotel in San Antonio from Keystone, which owned the property beneath the hotel along with the Riverwalk Mall. *Id.* at 911. Under the terms of their lease agreement, Keystone was obligated to give Host notice when it decided to sell to a third party "and afford [Host] a reasonable period of time" of up to 90 days in which to attempt to negotiate to purchase the property. *Id.* at 912.

When Keystone decided to sell both the hotel and the mall to a third party, it provided Host with 75 days' notice. Host never made an offer and, after initially telling Keystone it would waive its negotiation rights under the lease, Host

eventually sent a letter stating it would not provide a waiver.  *Id.*  Keystone sued after the sale fell through, claiming in relevant part that Host's letter caused the deal to falter because Keystone could not secure title insurance without a waiver. *Id.*

The jury awarded damages against Host and the trial court entered judgment for Keystone.  *Id.*  The court of appeals affirmed the damage award, but the Supreme Court reversed, finding that Keystone presented no evidence that Host's actions caused its damages.  Specifically, the Supreme Court held that no evidence supported causation because, among other things, (1) the title insurers never were going to insure without a waiver from Host; and (2) Host was never obligated to waive its rights.  *Id.* at 913-17.  Thus, the Court determined that Host's letter did not lead to the destruction of the deal.  *Id.* at 915 ("The deal failed not because of a letter, but because Keystone was unable to convince Host to voluntarily relinquish its rights.").

This is far different from Johnson's explicit testimony that it was the Bandier Defendants' actions that caused him to change his mind and abandon the deal.  [8 RR 29-31].  Even more importantly, unlike *HMC Hotel Properties*, Johnson explicitly testified that he would have continued forward with the deal if the Bandier Defendants had not caused Charter to reject Johnson's earnest money. [*Id.*].  Unlike *HMC Hotel Properties*, the jury also heard evidence of Johnson's

actions in moving forward with the deal despite knowledge that certain issues had not been resolved. *See supra* 10-13. Because the jury in this case had sufficient evidence to determine that the Bandier Defendants' actions caused SSC's damages, *HMC Hotel Properties* does not control and rehearing is proper.

**C.    The Court's decision creates bad policy.**

In addition to its failure to comply with *City of Keller*, the Court's opinion also creates a scenario in which a tortfeasor can insulate itself from liability by sabotaging a deal early enough to render damages uncertain. Indeed, under this Court's analysis, if a defendant breaks up a business relationship or transaction early enough in the process, it never can be liable for damages because the parties have not consummated a final deal:

> Here, the evidence showed only that Johnson might have consummated the deal or provided SSC with the funds to do so. This is not sufficient to establish to the but-for element of cause in fact, which requires reasonable certainty and cannot rest on a mere possibility.

[Op. at 20].

In addition to failing to properly credit evidence of Johnson's intention to continue with the deal absent the Bandier Defendants' actions, such a holding creates an incentive for wrongdoers to scuttle a transaction at the earliest point to prevent any liability for damages. The Court brushes these concerns aside and suggests that SSC should have sought equitable fee forfeiture. [Op. at 21-22].

This does not answer the problem created by the Court's holding. Although fee forfeiture may be available in certain fiduciary situations, it only applies when a deal has actually been consummated involving the fiduciary. Factually, this is a rare situation and, in any event, if a tortfeasor breaches its fiduciary duty effectively enough, then under the Court's holding, there would not be sufficient evidence to hold them liable for their actions—whether in equity or in damages. The Court can easily solve this problem by rehearing this case and altering its legal-sufficiency analysis to take into account the other evidence showing Johnson's willingness to move forward with the deal but for the Bandier Defendants' actions.

## CONCLUSION

For the foregoing reasons, SSC respectfully requests that the Court grant its motion for rehearing and affirm the trial court's judgment.

Respectfully submitted,

/s/ David Keltner
David E. Keltner
State Bar No. 11249500
david.keltner@kellyhart.com
Jody S. Sanders
State Bar No. 24051287
jody.sanders@kellyhart.com
**KELLY HART & HALLMAN LLP**
201 Main Street, Suite 2500
Fort Worth, Texas  76102
817.332.2500—Telephone
817.878.9280—Telecopier

**ATTORNEYS FOR APPELLEE**

## CERTIFICATE OF COMPLIANCE

1. This motion complies with the type-volume limitations of Texas Rule of Appellate Procedure 9.4(i)(2)(B) because it contains 3,619 words, excluding the parts of the motion exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

2. This motion complies with the typeface requirements of Texas Rule of Procedure 9.4(e) because this motion has been prepared in a proportionally spaced typeface using "Microsoft Word 2010" in fourteen (14) point "Times New Roman" style font.

/s/ David Keltner
David E. Keltner

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served upon counsel via electronic filing on October 12, 2015:

David M. Gunn
dgunn@beckredden.com
Erin H. Huber
ehuber@beckredden.com
Beck Redden LLP
1221 McKinney, Suite 4500
Houston, Texas  77010
*Counsel for Appellants*
*Bandier Realty Partners, LLC*
*and Switchback Ventures, LLC*

*/s/ David Keltner*
David E. Keltner

# Appendix A



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00782-CV

———————————

**BANDIER REALTY PARTNERS, LLC
AND SWITCHBACK VENTURES, LLC, Appellants**

**V.**

**SSC OPPORTUNITY PARTNERS, LLC, Appellee**

---

**On Appeal from the 215th District Court
Harris County, Texas
Trial Court Case No. 2011-43194**

---

## MEMORANDUM OPINION

A jury awarded appellee SSC Opportunity Partners, LLC $15 million in actual damages for fraud and breach of fiduciary duty in connection with a real-estate transaction. Appellants Bandier Realty Partners, LLC and Switchback Ventures, LLC appeal from the adverse judgment against them.

We conclude that, as in the case of *HMC Hotel Properties II LP v. Keystone-Texas Property Holding Corp.*, 439 S.W.3d 910 (Tex. 2014), the evidence is legally insufficient to support the jury's verdict with respect to its finding that any actual damages suffered by SSC were caused by the actions of Bandier Realty and Switchback. Since SSC did not pursue any other theory of recovery, we sustain the appellants' fourth issue, reverse the judgment of the trial court, and render judgment that SSC take nothing.

## Background

Douglas Britton formed SSC Opportunity Partners, LLC for the purpose of purchasing and developing real estate in the northern suburbs of Houston, where Exxon eventually built a corporate campus. Britton engaged the services of a real-estate broker, Bandier Realty Partners, LLC, in connection with this transaction.

On August 2, 2010, SSC entered into an earnest-money contract to purchase a 101-acre tract of land in Harris County for approximately $5 million. Within three days of the contract's execution, the buyer was required to deposit $25,000 in earnest money, which would become non-refundable after a period of due diligence. A down payment of $1 million was due at closing, and the sellers agreed to finance the remaining $4 million balance if the purchaser or its assignee could demonstrate its "financial strength" and close the transaction within the time allotted by the contract.

SSC lacked the $25,000 that was needed for the initial earnest-money payment. Robert D. Banzhaf and L.S. "Trey" Halberdier, III, who jointly owned Bandier Realty, began working with Britton to find investors. On August 4, 2010, Switchback Ventures, LLC—a company owned by Banzhaf and Halberdier— deposited $25,000 as earnest money.

Halberdier then asked Britton to sign a document that he said was intended to protect Switchback's $25,000 investment. Halberdier had drafted this agreement, which the parties call the "Switchback Agreement," in the form of a letter from Britton to Switchback, which identified Britton as "[t]rustee and agent to assist in the acquisition and/or contractual arrangements of . . . referenced land in Harris County." It stated that Britton was authorized by Switchback "to represent the interest, monetary consideration of Earnest Money in said Contracts, and perform Contracts for Trey Halberdier or any other Managing Member of Switchback Ventures, LLC and any other subsidiaries, partners or affiliates." The only land referenced was the 101 acres, and the only contract identified was the earnest-money contract that Britton had signed on behalf of SSC. The Switchback Agreement also stated that Britton would "take full directive from [Switchback] in terms of duties to perform, responsibilities, and any other actions that relate to the $25,000.00 earnest money deposit." Without reading it, Britton signed the document.

Britton, Halberdier, and Banzhaf then decided to search for a partner or purchaser to execute the real-estate transaction, and the men concurrently began discussions with different potential investors.

Britton began discussions with Larry Johnson, a successful Houston-area real-estate developer, about partnering to purchase and develop the property. Without committing to the investment, Johnson began due diligence, which revealed several concerns, including the availability of utilities, lack of road access to the 101 acres, and the conditions upon which sellers had predicated their offer of financing.

Halberdier and Banzhaf began discussions with other potential investors: Omero "Rocky" Del Papa, III, Kenneth R. Vaught, Jr., and their business entities Kenroc Development, LLC and Kenroc, LLC (collectively "Kenroc"). Britton encouraged Halberdier and Banzhaf's negotiations with Kenroc, and he gave them investment information to use in their presentations. Britton would later testify that he had authorized Bandier Realty to engage in these negotiations. Bandier Realty negotiated a potential deal with Kenroc. Contemporaneous emails from Britton showed that he understood the terms of the proposed deal—assignment of the earnest-money contract to Kenroc with both Bandier Realty and SSC later serving as real-estate brokers for subdivided parcels of land and both sharing in the commissions.

4

In addition, Bandier Realty negotiated its own contingent agreement with Kenroc and the sellers' agent. In an email dated November 28, Halberdier told the sellers' agent that if "Britton (SSC)" did not approve the Kenroc proposal, Bandier Realty would withdraw the earnest money from escrow, causing a default on the contract. At that point, Kenroc and Bandier Realty would enter into a new contract with the sellers with the same closing date, terms, and conditions. In another email sent later that day, Halberdier told Banzhaf, Del Papa, and Vaught that Britton had agreed to the Kenroc deal in principle.

But the next day, Britton entered into a letter agreement with Johnson. In exchange for a loan of $32,500, which was secured by a promissory note, Britton agreed to obtain an extension of the inspection period in the earnest-money contract and the deletion of its financial-strength provision. Britton further agreed that he would "work together exclusively" with Johnson "towards a mutually acceptable agreement for the assignment of the [earnest money] [c]ontract from Britton's affiliate to an affiliate of Johnson." That day, Britton gave Johnson a copy of the Switchback Agreement, which he referenced as "the only single document I have executed with Bandier."

Britton delivered to the title company a cashier's check in the amount of $32,500, representing the $25,000 earnest money and a payment of $7,500 to extend the inspection period. He also delivered a letter that he termed a "release,"

addressed to Switchback Ventures. Britton instructed the title company that it was "not authorized to release the Cashier's Check contained herewith until you receive a signed counterpart of the release and return a copy to me by email."

The letter to Switchback stated that its purpose was to return the $25,000 earnest money in full satisfaction of any duties Britton owed by virtue of the Switchback Agreement. It continued:

> Please acknowledge your receipt and acceptance of the foregoing in the appropriate place below, which shall in any event be deemed upon your acceptance of the Deposit being returned to you herewith, and which acceptance shall also be deemed an absolute quitclaim and release of any interest you may claim to any earnest money heretofore deposited pursuant to that certain purchase and sale agreement by and between SSC Opportunity Partners, LLC and OU Land Acquisition, LP and OU Land Acquisition Two, LP for a certain 100.61 acre tract of land located in Harris County, Texas (the "Contract").

> You are hereby again advised that your offer to invest money with Purchaser under the Contract is not accepted. The foregoing shall not be deemed to otherwise affect any commission to which you may be expressly entitled pursuant to the Contract.

Halberdier refused to sign the release. Rather, he asked Britton to assign the earnest-money contract from SSC to Bandier Realty.

The next day, the seller's agent contacted the title company to inquire about the earnest money, which had not yet been transferred. The Switchback earnest money was then sent to the sellers, and Johnson's earnest money was returned.

By now hostility had grown among the parties. Britton, Halberdier, and Banzhaf met at Johnson's office to attempt to resolve their differences. Johnson and the seller's agent were also present, but they left the room to allow the men to work out their problems. Two days later, Johnson informed Britton that he was no longer interested in the investment opportunity.

By early December 2010, there had been no showing of financial strength by SSC, Britton, Halberdier, Banzhaf, Switchback, or Bandier Realty. On December 6, the sellers informed SSC that it had two business days to deliver a letter of intent or an agreement among SSC, Bandier Realty, and Del Papa, the proposed equity partner, to be signed by all parties. In addition, the sellers offered one additional business day for Del Papa to satisfy the financial-strength provision.

On December 8, SSC, Bandier Realty, and Switchback entered into a memorandum of agreement ("MOA") calling for the formation of a business entity called "Newco"—to be owned by Bandier Realty, SSC, and a majority equity investor—that would acquire and develop the 101 acres. Bandier Realty and SSC would own equal minority shares of the entity. The following day, the sellers approved Del Papa's financial statements as satisfying the financial-strength provision.

Bandier Realty and Switchback then asked SSC to assign the earnest-money contract to Del Papa as trustee of yet another entity to be formed in the future. The

document that was sent to Britton, which the parties call the "Del Papa Assignment Agreement (DPAA)," included a provision, paragraph 8, which canceled and nullified the MOA signed the previous day by Bandier Realty and SSC. Britton struck out the language in paragraph 8 that canceled the MOA, signed the revised document, and sent it to Halberdier, Banzhaf, their attorneys, and the sellers' agent. With Britton's revisions, there were then two documents purporting to assign the earnest-money contract: the MOA which assigned the contract to Newco; and the DPAA as revised by Britton, which assigned it to Del Papa, as trustee, without nullifying the MOA. The sellers' agent informed Britton that unless he executed the assignment without striking through paragraph 8, the sellers would declare the earnest-money contract in default. Britton thereafter signed a clean copy of the DPAA. The DPAA provided that SSC would share equally in any commission received by Bandier Realty as a result of the earnest-money contract. But the DPAA made no provision for any further participation by SSC in the development of the 101 acres, and SSC did not participate further.

In July 2011, after Exxon announced its plans to build a corporate campus adjacent to the 101 acres, SSC filed the underlying lawsuit against the Bandier parties (Halberdier, Banzhaf, Bandier Realty Partners, LLC, Switchback Ventures, LLC, and Bandier Management Partners, LLC), the investors who had worked with them, and the title company that had handled the escrow. SSC alleged various

tort theories including breach of fiduciary duty and fraud. SSC also sought exemplary damages.

The case was tried to a jury. Britton's theory of the case was that SSC lost its opportunity to partner with Johnson to purchase and develop the 101 acres because the defendants—including Bandier Realty and Switchback—interfered and caused Johnson to back out of the transaction. Britton testified about how he came up with the idea for this particular development and the time and effort he spent to research its potential viability. He also testified that he had no money to finance it and had even borrowed money from his parents. Britton testified that Johnson had been very interested in pursuing this opportunity. Although the sellers' agent had already denied Johnson's request to extend additional time, Britton nevertheless believed he could persuade the sellers to extend the due-diligence period. Britton testified that when Johnson loaned him the earnest money, it was for the purpose of moving "forward towards closing." Britton contended that as a result of the defendants' actions, "SSC lost the option which it valued at $20 million."

Johnson testified, however, that he and Britton never reached an agreement about purchasing the 101-acre tract. He said that he had been confused about who had the rights to the contract and "still unsettled" on due diligence. He testified that there were numerous unresolved issues, any one of which would have been enough to end the deal. He identified a number of specific concerns, including: "when the

9

roads would be built," "whether Exxon was really going to go forward with their deal," "how the drainage would end up working," "getting road right-of-ways to extend some of the roads," and "how we were going to do the MUD districts." Johnson also said that he was not prepared to finalize a deal without an extension of the inspection period, and the sellers had not agreed to extend it.

The jury found in favor of SSC on its claims for fraud and breach of fiduciary duty, awarding $15 million in actual damages, plus exemplary damages against Bandier Realty Partners, Banzhaf, and Halberdier in the amount of $500,000 each.

## Analysis

"Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points that would afford the party the greatest relief." *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999). Accordingly, we begin by addressing the appellants' sufficiency-of-the-evidence arguments because they apply to all claims and both remaining defendants. In addition, reversal on the grounds of legal insufficiency would result in rendition of judgment for Bandier Realty and Switchback. *See id.*; *see also* TEX. R. APP. P. 43.3 ("When reversing a trial court's judgment, the court must render the judgment that the trial court should have

10

rendered, except when: (a) remand is necessary for further proceedings; or (b) the interests of justice require a remand for another trial.").

We review legal sufficiency challenges to determine whether the evidence "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In determining whether legally sufficient evidence supports a challenged finding, we must consider the evidence that favors the finding if a reasonable factfinder could, and we must disregard evidence contrary to the challenged finding unless a reasonable factfinder could not. *Id.* We may not sustain a legal sufficiency, or "no evidence," point unless the record demonstrates: (1) a complete absence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. The factfinder may choose to "believe one witness and disbelieve others" and "may resolve inconsistencies in the testimony of any witness." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *see City of Keller*, 168 S.W.3d at 820–21.

Proximate cause is an element of each of SSC's tort claims. *See Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 423 (Tex. 2015) (fraudulent inducement); *ERI Consulting Eng'rs v. Swinnea*, 318 S.W.3d 867, 881 (Tex. 2010)

(civil conspiracy); *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) (tortious interference with a contract); *Finger v. Ray*, 326 S.W.3d 285, 291 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (breach of fiduciary duty). There may be more than one proximate cause of an occurrence. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010).

"The components of proximate cause are cause in fact and foreseeability." *Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 929 (Tex. 2015). "Cause in fact is essentially but-for causation." *Id.* A tortious act satisfies the cause-in-fact component of proximate cause when it is "a substantial factor in causing the injury and without which the injury would not have occurred." *Del Lago Partners*, 307 S.W.3d at 774 (citing *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005)). "If the defendant's negligence merely furnished a condition that made the injury possible, there can be no cause in fact." *Urena*, 162 S.W.3d at 551.

Proximate cause "cannot be established by mere conjecture, guess or speculation." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). To establish causation, the evidence "must show more than a possibility." *Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 706 (Tex. 1970). "Verdicts must rest upon reasonable certainty of proof." *Id.* Cause in fact may be established by direct or circumstantial evidence, including expert-opinion testimony. *See, e.g.*, *Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 459 (Tex.

12

1992). However, "[b]are baseless opinions will not support a judgment even if there is no objection to their admission in evidence." *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009). When an expert opinion is admitted without objection, it may be considered probative even if its basis is unreliable. *Id.* at 818. "But if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *Id.* "[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999).

The jury in this case found that Bandier Realty breached its fiduciary duty to SSC, intentionally interfered with the earnest-money contract, participated in a civil conspiracy that damaged SSC, and fraudulently induced SSC to enter into the Del Papa Assignment Agreement. The jury also found that Switchback participated in Bandier Realty's breach of fiduciary duty, participated in a civil conspiracy that damaged SSC, and assisted or encouraged Bandier Realty's interference with the earnest-money contract.

Appellants challenge the evidentiary basis for the jury's conclusions. Specifically, they contend that SSC lacked the financial ability to exercise the option by purchasing the land for $5 million on its own, and its only potential investor, Larry Johnson, would not have invested in the project regardless of their

actions. As such, the appellants argue there was legally insufficient evidence that their actions were a but-for cause of SSC's failure to acquire the property.

In response, SSC argues that Johnson's actions and testimony created a fact issue about whether he would have "proceeded with the SSC deal" but for the actions of Bandier Realty and Switchback. In particular, it contends that Johnson's action in "giving SSC the non-refundable earnest money," despite knowing that the sellers had not extended the inspection period or deleted the financial-strength provision, showed that he would have moved forward with the deal. SSC argues that this action conflicted with Johnson's testimony, creating a credibility issue that the jury resolved in its favor and which we must credit under the applicable standard of review. SSC argues that the jury was "free to conclude" that both the conduct of Bandier Realty and other concerns about the property "played a role in Johnson's departure." Thus, SSC reasons that the jury's finding that Bandier Realty and Switchback proximately caused its injuries is supported by sufficient evidence.

We disagree with SSC's depiction of the record. First, the evidence showed that SSC lacked the financial ability to purchase the land for $5 million without an investor or equity partner. Although Britton asserted at trial that he could have closed the deal, he conceded on cross-examination that he could not have done so without investors. Similarly, the sellers' agent also testified that SSC lacked the

financial ability to purchase the property independently. In addition, SSC never satisfied the financial-strength provision, which was a necessary condition for the sellers to finance the $4 million balance that would have remained after the $1 million down payment. Under the earnest-money contract, the failure to satisfy the financial-strength provision was grounds for the sellers to declare the contract in default.

Second, there is no evidence that Johnson intended to purchase the 101 acres, give or loan SSC the money to do so, invest in SSC, or form a joint business entity with SSC for the purpose of purchasing and developing the property. Johnson testified that he was interested in the property, but the unfinished due diligence would have been enough to end the deal for him. He testified that he was concerned about the lack of utilities, drainage, rights of way, access roads, and annexation by a MUD district. Without an extension of the inspection period, any one of these unresolved issues was "a killer," significant enough for him to decline the investment opportunity. Yet he never received any assurance that the inspection period would be extended, which meant that he would not go forward with the transaction.

The only written agreement between Johnson and SSC was the November 29 "Letter Agreement Regarding Assignment of Contract." This document did not purport to actually assign the earnest-money contract. Instead,

15

the parties agreed "to work together exclusively towards a mutually acceptable agreement for the assignment of the Contract from Britton's affiliate to an affiliate of Johnson which benefits both Britton and Johnson prior to the end of the Inspection Period." It also required Britton to obtain an extension of the inspection period and deletion of the financial-strength condition. This agreement did not provide any terms of financial compensation, carried interest, or any sort of profit sharing. By its plain terms it was an executory contract that did not immediately assign the earnest-money contract.

Still SSC argues that Johnson's provision of $32,500 in nonrefundable earnest money showed, contrary to his testimony, that he was prepared to assume the contract and consummate the deal and was willing to abandon his demands to delete the financial-strength condition and extend the inspection period. However, the evidence in the record shows that the $32,500 was a loan secured by a promissory note. Thus, while the earnest money was nonrefundable as to SSC, Johnson's investment was not at risk: he could recover his money from Britton. In addition, Johnson's letter agreement with Britton provided that the consideration for the loan was Britton's promise to obtain an extension of the inspection period and a deletion of the financial-strength condition. There is no evidence in the record that Johnson abandoned these demands. Instead, his testimony unequivocally showed that he would not proceed with the deal without an

extension of the inspection period, an option that was available to him under the letter agreement with Britton.

The insufficiency of this evidence is evident in light of a similar case recently decided by the Supreme Court of Texas, addressing an issue of but-for causation in a case arising from a real estate deal that fell through. The case of *HMC Hotel Properties II LP v. Keystone-Texas Property Holding Corp.*, 439 S.W.3d 910 (Tex. 2014), involved the attempted sale of the Rivercenter Mall and the land beneath the San Antonio Riverwalk hotel. *HMC Hotel Props. II LP*, 439 S.W.3d at 911. The hotel leased the land beneath it from Keystone-Texas Property Holding Corporation. *Id.* The lease included a right-of-first refusal provision, affording it up to 90 days to attempt to negotiate an agreement to purchase the land if Keystone decided to sell it. *Id.* at 911–12. Nothing in the lease required the hotel to execute a waiver of this provision if it chose not to purchase under those circumstances. *Id.* at 914–15.

After the properties were listed for sale, a potential buyer emerged for the two properties, offering $166 million for both. *Id.* at 911. Keystone invited the hotel to make an offer to purchase, but it also requested the hotel waive its rights under the lease provision. *Id.* at 912. The hotel initially indicated that it would sign the requested waiver, but after meeting with the potential buyer, the hotel suspected that the purchase price had been inflated to discourage it from making an

17

offer. *Id.* At that point, the hotel informed Keystone by letter that no waiver was forthcoming. *Id.* Notably, at all relevant times, the title insurers had stated that they required a waiver from the hotel in order to issue a "clean" title insurance policy. *Id.* at 913–14.

When the sale of the land beneath the hotel fell through, the hotel sued for breach of contract, and Keystone countersued for tortious interference with a contract. *Id.* at 912. The jury found for Keystone, which had argued that the letter from the hotel had been "passed to the proposed title insurers, [and had] scuttled the sale." *Id.* The court of appeals held that the evidence was sufficient to show that the letter "proximately caused the deal's demise." *Id.*

In the Supreme Court, the hotel argued that there was no evidence of but-for causation, i.e., "no evidence show[ed] the outcome would have been different if [the hotel] had not sent its letter." *Id.* at 913. The Supreme Court agreed. First, it observed that the hotel had no obligation to provide the waiver that the title insurers demanded, and that there was no evidence that the insurers would have dropped that demand. *Id.* at 915. Second it rejected testimony about how the title insurers might have "insured around" the lease provision after the expiration of 90 days and in the absence of the hotel's letter. *Id.* at 916. The Supreme Court said, "[I]n the end, all of this testimony is simply speculation about what the title insurers might have done had [the hotel] handled itself differently. Testimony

18

based on nothing but speculation is evidence of nothing at all." *Id.* Third, the Court agreed that the evidence showed that the hotel's letter had a "substantial effect" on the deal, but it explained that "testimony that the letter was a substantial factor in bringing about harm to Keystone is only half of the cause-in-fact element. . . . Keystone also had to show that absent [the hotel's] letter, the harm would not have occurred." *Id.* at 917 (citation omitted).

This case is similar to *HMC Hotel Properties*. SSC's argument that Johnson would have provided the funding it needed to exercise the option but for the actions of the appellants fails because it is too speculative. Nothing in the evidence shows that Johnson would have provided SSC with funding but for the actions of Bandier Realty and Switchback. Rather, the evidence shows that even if the substituted earnest money had been accepted, and even if Halberdier, Banzhaf, and Britton had comported themselves amicably and with civility at the meeting on December 1, Johnson still would have harbored doubts about the investment because his due diligence was incomplete. There is no evidence in the record that Johnson would have retreated from his demand to eliminate the financial-strength condition or to extend the inspection period. And his loan of money to Britton did not require him to abandon those demands. To the contrary, it was predicated upon them.

Here, the evidence showed only that Johnson might have consummated the deal or provided SSC with the funds to do so. This is not sufficient to establish to the but-for element of cause in fact, which requires reasonable certainty and cannot rest on a mere possibility. *See Lenger*, 455 S.W.2d at 706.

SSC argues that because there can be more than one proximate cause, the jury was "free to conclude" that the conduct of Bandier Realty and Switchback "played a role in Johnson's departure." We agree that the evidence supports such a conclusion. Johnson testified that he became "disgusted" by the conduct of Bandier Realty, i.e., Halberdier and Banzhaf, as well as that of Britton. He testified that it created doubt as to who was in control of the earnest-money contract. But the question before us is whether the evidence supports the verdict actually rendered, which included an award of actual damages. Actual damages require proof of causation. *See Doe*, 907 S.W.2d at 477; *Lenger*, 455 S.W.2d at 706. And evidence that the appellants played a role in bringing about the injury SSC complains of "is only half of the cause-in-fact element." *HMC Hotel Props.*, 439 S.W.3d at 917. SSC also had to show that absent the conduct of Bandier Realty and Switchback, the injury would not have occurred. *Id.* This they failed to do.

Finally, SSC argues that as a matter of policy, a finding that the evidence was insufficient to support the verdict as to causation would "create an unintended safe-harbor from liability for defendants who breach their fiduciary duties early in

a transaction." It argues that the appellants' actions "chas[ed] off Johnson before he could finalize the SSC deal." It argues that we therefore should affirm based on "the settled principles that a fiduciary should be punished for its breaches and that relationships of trust should be protected."

Texas law provides equitable remedies for breach of fiduciary duty that are distinct from awards of actual damages. *See, e.g.*, *ERI Consulting Eng'rs, Inc.*, 318 S.W.3d at 874 (equitable forfeiture is distinguishable from an award of actual damages because it serves a separate function of protecting fiduciary relationships); *Burrow*, 997 S.W.2d at 240 (fee forfeiture available in absence of proof of actual damages for an attorney's breach of fiduciary duty); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 573–74, 160 S.W.2d 509, 514 (1942) ("It would be a dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired."); *Saden v. Smith*, 415 S.W.3d 450, 469 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) ("Even if a fiduciary does not obtain a benefit by violating his duty, he still may be required to forfeit the right to compensation for his work.").

SSC did not seek the alternative remedy available to it under Texas law: fee forfeiture. Bandier Realty was SSC's broker, and its payment was the commission it earned when the sale of the 101 acres was closed. SSC did not seek recompense

21

for the commission Bandier Realty earned. In addition, although SSC did seek damages for unjust enrichment, the jury returned a take-nothing verdict on that question. Thus, we reject SSC's policy-based arguments.

We sustain the appellants' fourth issue, and we hold that the evidence is legally insufficient to support the verdict as to causation. As a result of our resolution of this issue, it is unnecessary for us to address the other arguments raised by the appellants. TEX. R. APP. P. 47.1.

## Conclusion

We reverse the judgment of the trial court and render judgment that SSC take nothing from appellees Bandier Realty Partners and Switchback Ventures.


Michael Massengale
Justice

Panel consists of Chief Justice Radack, and Justices Higley and Massengale.